529 So.2d 434 (1988)
STATE of Louisiana
v.
Johnny DICKERSON.
No. 88 KA 0050.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
*435 Charles Genco, Amite, for plaintiff-appellee.
Johnny Dickerson, Angola, in pro. per.
Michael S. Gallagher, Loyola University, New Orleans, for defendant-appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
On November 13, 1986, Johnny Dickerson (defendant) was indicted by the Tangipahoa Parish Grand Jury for first degree murder, LSA-R.S. 14:30, aggravated kidnapping, LSA-R.S. 14:44, and armed robbery, LSA-R.S. 14:64. On March 11, 1987, the indictment was amended to reduce the first degree murder charge to second degree murder, LSA-R.S. 14:30.1. These offenses stem from the death of Walter Talley, Jr., on or about April 24 or 25, 1981. Defendant pled not guilty, and, after a jury trial which began on June 1, 1987, was found guilty as charged. On the charge of second degree murder, the court sentenced defendant to be imprisoned with the Department of Corrections for life without benefit of probation, parole, or suspension of sentence. On the charge of aggravated kidnapping, the court sentenced defendant to be imprisoned with the Department of Corrections for life without benefit of probation, parole, or suspension of sentence. On the charge of armed robbery, the court sentenced defendant to serve 50 years with the Department of Corrections without benefit of probation, parole, or suspension of sentence. Defendant has appealed to this court with three assignments of error.
FACTS
Early on the morning of April 25, 1981, Talley's body was found by some fisherman near the Manchac exit of Interstate 55 in Tangipahoa Parish. He had been shot with a high-caliber pistol in the back of the head. Later that same day, Melvin Landry, who had a wrecker service, towed a burned Datsun automobile which he found in a secluded area to his yard in adjoining Livingston Parish. The Tangipahoa Parish Sheriff's Office (TPSO) got its first lead as to the victim's identity two weeks' later when St. Tammany Parish officials put it in touch with Talley's family. TPSO learned that Talley was involved in drug dealing and that Barbara Rogers Dickerson[1] was his Hammond connection.
*436 On June 20, 1981, Eric Sivula, a lieutenant with the Louisiana State Police and commander of its vehicle theft investigation section, went to Landry's Wrecking Yard and examined the burned Datsun. After finding the confidential vehicle identification number and running a check, he learned that the vehicle was registered to Walter F. Talley.
After the vehicle was identified as belonging to Talley, Barbara was questioned by TPSO deputies, and defendant became a suspect. Some time later, she agreed to be a witness and was granted immunity from prosecution. At trial, she was the state's star witness.
Barbara testified that she had been married to defendant but was divorced from him on December 19, 1979; that, notwithstanding their divorce, defendant continued to live with her "on and off"; that she sold marijuana for Talley; that she was on five years' probation from the 19th Judicial District Court for distribution of Quaaludes; and that she gave a statement regarding Talley's death to TPSO in October of 1982.
Barbara testified that she was present at the scene of Talley's murder. She said that after Talley had been robbed of a sizeable amount of cash and drugs, she and defendant took him, bound and gagged, to a place near Manchac, where defendant walked Talley away. A short time later, she heard a shot, and defendant returned alone. They then burned Talley's car, and defendant disposed of the gun in the Tickfaw River. They spent the night at the Ramada Inn in Hammond and returned to her residence the next morning. The next day, defendant came back driving a black Monte Carlo. They went together to a car lot, and defendant bought her a green Monte Carlo. She insisted she never told anyone that Brian Foret[2] killed Talley.
Jessie Lord, defendant's fellow prisoners from May of 1984 until June of 1985 while both were in federal custody in Pennsylvania, agreed to become a witness after he contacted TPSO authorities in August, 1984. Lord testified that he learned from defendant during the period they were fellow prisoners various details of the homicide; that he talked to TPSO Detective Larry Westmoreland on several occasions; and that the story defendant told him was that defendant killed Talley after Barbara set Talley up.
Hilda Coniglio also testified for the state. She and her husband own a car lot in Tangipahoa Parish. She testified that between 4:00 p.m. and 6:00 p.m. on April 25, 1981, she sold a green Monte Carlo to Barbara Dickerson for $1,500.00 cash; and that a man was with Barbara but stayed in the background during the entire negotiations. After describing the man, she pointed to defendant in the courtroom and identified him as the man who was with Barbara.
Ruby Dickerson, defendant's mother, testified for him. She said that Barbara told her twice that she lied to police about defendant and Talley's murder out of jealousy and revenge and that Brian Foret had done it. Rose Brenner, who had known defendant for twenty years, gave substantially the same testimony as defendant's mother.
Gloria Foret testified for defendant. Her testimony was that Barbara was extremely jealous of her friendship with defendant to the extent of deliberately damaging her car while she visited defendant; that Barbara continually harassed her over the telephone, which prompted her to report it to the authorities; that her husband died on February 4, 1983, of cancer; that her husband used and sold drugs; but that she did not think he had killed Talley because he was in "bad shape" at the time.
John S. Campbell, a federal inmate serving time for bank robbery, also testified for defendant. He said that Brian Foret told him that he (Brian) took Talley out to the country and shot him because Talley had turned "narc" to save himself from prosecution. After Campbell's less than convincing testimony, defendant released three *437 federal prisoners from subpoenaes who, along with Campbell, had been summoned at considerable expense to Tangipahoa Parish to testify. These prisoners were identified as Mr. Chandler, Mr. Kessler, and Mr. Torres.
B.J. Felder also testified. He testified that Barbara told him that Brian killed a man near Manchac under a bridge because a drug deal "went sour."
ASSIGNMENT OF ERROR NUMBER ONE
We have gone into the facts as adduced at trial at some length to place in proper perspective the primary issue defendant raises in this case, i.e., that his constitutional right to a speedy trial was violated because of the long delay from the time he became a suspect until he was indicted and tried. The following factual chronology will help put defendant's speedy trial claim in focus:
04/25/81 Talley's murder
09/2/82 Defendant is sentenced to 3½ years
 in federal confinement for a firearms
 violation (his sentence was later increased
 to 4½ years because of an
 attempted escape)
02/3/83 Arrest warrants issued by TPSO
 against defendant, charging him with
 first degree murder and aggravated
 kidnapping
02/4/83 Brian Foret's death
02/15/83 Detainers received by federal authorities
 at the Memphis Correctional Institute
 where defendant was housed
 at the time
03/20/83 Defendant files the first of many motions
 for speedy trial with the 22nd
 Judicial District Court
09/18/86 Defendant completes his federal time
 and is held for TPSO
09/26/86 Defendant is returned to Louisiana
 and arrested for murder, kidnapping,
 and robbery
11/13/86 Defendant is indicted for first degree
 murder, aggravated kidnapping, and
 armed robbery
11/24/86 Defendant is arraigned for said offenses
04/27/87 State amends indictment to charge
 defendant with second degree murder,
 aggravated kidnapping, and armed
 robbery
06/1/87 Defendant's trial begins on said offenses
Within a matter of weeks after detainers were placed against him, defendant began pro se legal maneuvers to obtain a speedy trial. His motions addressed to the 22nd Judicial District were either denied or not formally acted upon. His requests for state appellate review were denied. His petition for federal habeas corpus relief was denied by the United States District Court for the Eastern District of Louisiana on February 12, 1986. Defendant then appealed to the United States Fifth Circuit Court of Appeals. Dickerson v. Louisiana, 816 F.2d 220 (5th Cir.1987), which also denied pretrial relief. The Fifth Circuit's opinion is dated May 13, 1987. The case was submitted after defendant had been released from federal confinement and returned to Louisiana, where he had been arrested, indicted, and was incarcerated awaiting trial. The Fifth Circuit articulated its task as follows: "to determine whether Dickerson is entitled to raise his speedy trial and due process claims through federal habeas corpus proceedings before Louisiana has tried him on state charges when his constitutional claims can be raised at his state trial." (Footnote omitted.) 816 F.2d at 224.
Although the case has reached us on appeal after trial, we note that the pretrial factors as considered by the United States Fifth Circuit have not changed and, though in a different posture, are the very same factors that we must review in considering defendant's first assignment of error.
In disposing of defendant's pretrial habeas corpus claim, the Fifth Circuit discussed Braden v. Thirtieth Judicial Circuit Court, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed. 2d 443 (1973), and noted it must resolve whether defendant had exhausted his state remedies. It discussed the long-established principle that:
"federal habeas corpus does not lie, absent `special circumstances', to adjudicate the merits of an affirmative defense to a state criminal charge prior to a judgment of conviction by a state court." Braden, 410 U.S. at 489, 93 S.Ct. at 1127. The Court also stated that "nothing we have said would permit the derailing of a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court." Id. at 493, 93 S.Ct. at 1129. The Court's discussion *438 indicates that there is a distinction between a petitioner who seeks to "abort a state proceeding or to disrupt the orderly functioning of state judicial processes" by litigating a speedy trial defense to a prosecution prior to trial, and one who seeks only to enforce the state's obligation to bring him promptly to trial. Brown [v. Estelle], 530 F.2d at 1283 [(5th Cir.1976)]. In Brown we stated that this distinction turns upon the type of relief sought:
[A]n attempt to dismiss an indictment or otherwise prevent a prosecution is of the first type, while an attempt to force the state to go to trial is of the second. While the former objective is normally not attainable through federal habeas corpus, the latter is, although the requirement of exhaustion of state remedies still must be met.

Brown, 530 F.2d at 1283
Dickerson v. Louisiana, 816 F.2d at 226.
After discussing Braden, it refused to extend "special circumstances" to include defendant and his argument that his denial of a speedy trial obviated the exhaustion requirement and entitled him to a dismissal of the indictment.
Later, the court, in footnote 14, expressly refused to rule on the merits of defendant's speedy trial claim and said:
We express no opinion on the merits of Dickerson's sixth amendment claim, and particularly on the question of whether the detainer filed with the federal government by Louisiana causes consequences that trigger his sixth amendment rights. See United States v. Loud Hawk, 474 U.S. 302 [309-312], 106 S.Ct. 648, 653-54, 88 L.Ed.2d 640, 651 (1986) (quoting United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed. 2d 468 (1971)) ("[O]nly the `actual restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections of the speedy trial provision of the Sixth Amendment'") (emphasis added in Loud Hawk).
Dickerson v. Louisiana, 816 F.2d at 227.
Defendant's speedy trial claim has been presented to and denied by the trial court, and it is now ripe for appellate review in state court.
In United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), the Supreme Court said:
In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), this Court considered the significance, for constitutional purposes, of a lengthy preindictment delay. We held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since our analysis of the language, history, and purposes of the Clause persuaded us that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge... engage the particular protections" of that provision. Id., at 320, 92 S.Ct., at 463. We went on to note that statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide "`the primary guarantee, against bringing overly stale criminal charges.'" Id., at 322, 92 S.Ct., at 464, quoting United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). But we did acknowledge that the "statute of limitations does not fully define [defendants'] rights with respect to the events occurring prior to indictment," 404 U.S., at 324, 92 S.Ct., at 465, and that the Due Process Clause has a limited role to play in protecting against oppressive delay.
(Footnote omitted.)
In United States v. Loud Hawk, 474 U.S. 302, 106 S.Ct. 648, 654, 88 L.Ed.2d 640 (1986), the Supreme Court said:
The Speedy Trial Clause does not purport to protect a defendant from all effects flowing from a delay before trial. The clause does not, for example, limit the length of a preindictment criminal investigation even though "the [suspect's] knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life." Id., 456 U.S. 1, 102 S.Ct. 1497 at 1502, 71 L.Ed.2d 696.
*439 We hold that, for purposes of defendant's Sixth Amendment defense, we need not answer the question posed by the Fifth Circuit as to whether the detainers filed by the TPSO, under the circumstances of this case, constituted an actual restraint because those detainers charged defendant with first degree murder and aggravated kidnapping. Under Louisiana law, specifically LSA-C.Cr.P. art. 571, there is no time limitation upon the institution of prosecution for any crime for which the punishment may be death or life imprisonment. Both first degree murder, second degree murder, and aggravated kidnapping fall into that category. The United States Supreme Court decisions which consider Sixth Amendment rights, like United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), etc., do not deal with offenses with imprescriptable time limitations under state law.
We still must address the substantial issue of whether defendant's due process rights under the Fifth and Fourteenth Amendments were denied because of the pre-indictment delay. In addressing this argument, we again look to United States v. Marion for guidance:
However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases.
(Footnotes omitted.) United States v. Marion, 92 S.Ct. at 465-466.
Also, to show a violation of due process from pre-indictment delay that would require dismissal of the indictment, a defendant must show that the government deliberately delayed bringing the indictment in order to gain a tactical advantage and that the delay caused defendant actual and substantial prejudice in presenting his defense. United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), as cited in United States v. Antonino, 830 F.2d at 800. Defendant argues that five of his witnesses have died. At the hearing of his speedy trial motion, he discussed what those witnesses would have testified to had they been available. We are not impressed, especially when we consider his testimony in light of United States v. Antonino, 830 F.2d 798 (7th Cir. 1987), where the United States Seventh Circuit, in addressing a similar argument, said:
The mere passage of time without more is not sufficient. Perry, 815 F.2d [1100] at 1103 [(7th Cir.1987)] (citing Brock, Williams, Watkins, and Solomon); see also United States v. Helmich, 521 F.Supp. 1246 (M.D.Fla.1981) (no showing that seventeen year delay caused actual prejudice). To show the necessary "high degree of prejudice," it was not enough that a nineteen-month delay permitted defendant's "borderline personality disorder" and "organic personality syndrome" to worsen, making it more difficult for him to testify in his own behalf. Perry, 815 F.2d at 1103-04.
The most common stumbling block for defendants has been the requirement that in order to show actual prejudice they point quite specifically to how they were prejudiced; the defendant's showing must be concrete, not speculative. Thus, actual prejudice was not shown by the fact that two potential witnesses died during the pre-indictment delay, where the defendant made only general allegations of prejudice. Solomon, 688 F.2d [1171] at 1179 [ (7th Cir.1982) ]. Nor was it enough to claim that the delay made it impossible to credibly reconstruct events, where the defendant alleged no specific prejudice. Watkins, 709 F.2d at 475 [(7th Cir.1983)]. Similarly insufficient was defendant's claim that his memory *440 may have faded. Brock, 782 F.2d [1442] at 1444 [(7th Cir.1986)]. A defendant must do more than allege that a particular witness is no longer available and that the witness's testimony would have helped the defense. Brown, 742 F.2d [359] at 362 [(7th Cir.1984)]. "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice." Id. (quoting United States v. Jenkins, 701 F.2d 850, 855 (10th Cir. 1983)). 830 F.2d at 805.
During the hearing on the speedy trial motion, defendant testified that John Schuck, who had died, would have testified that he was a party to a three-way telephone conversation between defendant and Barbara, and that Barbara stated she lied to police for jealousy and revenge; that defendant did not commit the crime, and that Brian Foret did. At best, this impeachment testimony would have been cumulative because at trial defense witnesses Ruby Dickerson and Rose Brenner both testified to the exact same facts.
Defendant also testified that Vince Bruno, Mrs. Charles T. McClendon, Lottie Baham, and Eddie Davridge, all had died and were unable to testify; that he had witnesses, Mazel Chattham and Kathy Chattham, and Bill and Peggy Phillips, whose whereabouts now (at the time of trial) were unknown to him; and that all these witnesses could have helped substantiate his alibi that he had been at his mother's house in Natalbany on April 24, 1981.
We note that at trial, defendant produced no evidence of any kind regarding an alibi for the time of the murder. His mother testified but was not even asked if defendant was at her home on the night of the homicide.
Defendant also argues that his status as a federal prisoner was changed after the detainers were filed, as his security rating went from a level four to a level six, maximum security; and that this change in status prevented him from furloughs, work release, school participation, and caused him to be "locked down" in a one-man cell for 23 hours per day with only one hour per day for a shower and exercise. A level four security clearance meant better living conditions in a two-man cell with carpets on the floor, telephone access, movies, outside recreation, and school.
We expressly refuse to extend the actual prejudice predicate as articulated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to this argument. The prejudice which the United States Supreme Court was referring to was prejudice relating to defendant's right to a fair trial. We will not extend it to the loss of confinement perks, especially under the facts we have here. Defendant's testimony was completely unsubstantiated, and he had attempted an escape twice while in federal confinement.
If the state for some tactical advantage, as noted in Lovasco, delayed this prosecution, then perhaps defendant's due process claim would have more substance. The TPSO deputies all testified that their investigation was an ongoing one. Now that the trial has been completed, we have a better insight into the state's reason for delay, and we agree that TPSO's statement that it was seeking additional evidence was a reasonable one. Initially, all it had was Barbara's story. She was a convicted drug distributor who had an ongoing sexual relationship with defendant but also some sort of relationship with Brian Foret. She was extremely jealous of defendant's relationship with Gloria Foret. She had threatened defendant and Gloria Foret. The state knew all this and, notwithstanding the fact that Barbara's story may have provided probable cause to issue an arrest warrant, the state could have reasonably felt that it needed additional evidence to obtain a conviction because Barbara's credibility was subject to defense attack. Pre-indictment investigation is a valid reason for delay. Lovasco, 97 S.Ct. at 2052.
Hilda Coniglio's testimony, while helpful, could have been considered circumstantial, especially in view of Gloria Foret's testimony that defendant's and Brian Foret's general descriptions were very similar. The defense did not make an issue of the accuracy *441 of Coniglio's spontaneous in-court identification of defendant. We do not know from the record whether the State knew this witness would identify defendant. Regardless, it should have been apprehensive over the veracity of any court identification she might make.
Jessie Lord, a federal prisoner with a long and seamy record, initially came forward in the latter part of 1984 and then maintained communications with Tangipahoa authorities until about the time of defendant's release from federal confinement. After Lord came forward, the state could have reasonably felt more comfortable about sustaining its burden of proof. However, even at this point, it had reason to be apprehensive in view of the potential heavy attack that could have been made on Lord's credibility.
Ultimately, the state went with the witnesses it had, and defendant was tried quickly after his indictment. A jury convicted him on the state's evidence, and defendant has not questioned the state's sufficiency of evidence.
The facts and circumstances surrounding this assignment of error require us to answer the query, as to whether the detainers filed with the federal government by Louisiana caused consequences which triggered defendant's Sixth Amendment rights as well as his rights under the due process clause, in the negative. This assignment has no merit.
ASSIGNMENT OF ERROR NUMBER TWO
Defendant complains that the trial court should have granted him a new trial because he discovered new evidence after trial. The new evidence consisted of Brian Foret's medical records to refute the state's rebuttal that Foret was too ill in August, 1981, to have committed this murder.
On rebuttal, the state called Joe Foret, Brian's father, to rebut the defense that Brian had committed the murder. The elder Foret testified that his son died on February 4, 1983, of cancer; that Brian had been very sick and had come to live with him in Baton Rouge in 1981; that Brian was living with him on April 24, 1981; that Brian had lost a lot of weight; and, that while Brian was able to move around, he was not able to drive or make any trips outside Baton Rouge.
At defendant's post-trial motion for new trial, he introduced documentary medical evidence which basically showed that Brian Foret's medical problems in 1981 were orthopedic in nature and that it was not until January of 1983, that he complained of the kind of weakness that was later diagnosed as cancer. Dickerson's new trial motion is based on LSA-C.Cr.P. art. 851(1-3):
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
In State v. Spears, 504 So.2d 974, 979 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987), we recently stated:
In a motion for new trial based upon the discovery of new and material evidence, the burden is on the defendant to show that the new evidence was not discoverable prior to or during trial and that, if the evidence had been introduced at trial, the new evidence probably would have caused the trier of fact to reach a different verdict. State v. Clayton, 427 So.2d 827 (La.1983) (on rehearing). In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another *442 jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. State v. Buchanan, 439 So.2d 576 (La. App. 1st Cir.1983). Furthermore, the trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Buchanan, 439 So.2d at 583.
Defendant failed in his burden of proof. Brian Foret's medical evidence was discoverable prior to and during trial. Defendant's only defense has throughout these proceedings consistently been that Brian Foret, rather than he, committed the murder. Since Foret died on February 4, 1983, the defense could and should have discovered facts surrounding his medical history prior to trial. We note, furthermore, that the trial court found nothing incompatible between the medical records and Joe Foret's testimony. Brian Foret had been ill for some time, but cancer was not diagnosed until early 1983. We also note that Gloria Foret, a defense witness, testified that she did not believe Brian Foret killed Talley because he was in "bad shape" and "all strung out." This assignment of error has no merit.
ASSIGNMENT OF ERROR NUMBER THREE
Finally, defendant complains that the trial court erred in denying his pretrial motion for an investigator funded by the state. Defendant, however, has shown no prejudice arising from the trial court's refusal to fund an investigator for him. The record shows that over $16,000.00 was expended by Tangipahoa Parish to pay for witnesses, travel fees, and expenses for defendant's witnesses. Defendant has not shown what the funded investigation would discover for him. His defense was presented, but the jury did not believe his witnesses. He excused three witnesses without letting them testify, even though they came from out of state. He put on no alibi defense at all, and his main reason for wanting the investigation was to find witnesses who could back up his alibi that he was at his mother's house watching television on April 24, 1981. Yet his mother was not given the opportunity to testify on this important point. Since defendant has shown no prejudice, we find no error, and this assignment of error has no merit.
For the reasons set forth, defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] She is now Barbara Hebert. She is defendant's former wife; however, at the time of the homicide, they were still living together "on and off."
[2] This name is spelled "Forret" in the transcript; however the documents introduced into evidence spell it "Foret." His name appears throughout this record. Dickerson's defense is that Foret killed Talley over a drug deal that "went sour."