550 So.2d 774 (1989)
STATE of Louisiana, Appellee,
v.
Ronnie Glenn DAVIS, Appellant.
No. 20790-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1989.
*775 Otha Nelson, Baton Rouge, for appellant.
William J. Guste, Jr., Atty. Gen., William B. Faust, III, Asst. Atty. Gen., Baton Rouge, James A. Norris, Jr., Dist. Atty. and John P. Spires, Asst. Dist. Atty., Monroe, for appellee.
Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
The defendant, Ronnie Glenn Davis, was indicted on charges of armed robbery, in violation of LSA-R.S. 14:64; aggravated crime against nature, in violation of LSA-R.S. 14:89.1; and aggravated rape, in violation of LSA-R.S. 14:42. After a jury trial on the three-count indictment, the defendant was convicted of first degree robbery, aggravated crime against nature, and aggravated rape. The defendant was sentenced to serve 20 years at hard labor without benefit of parole, probation, or suspension of sentence on the charge of first degree robbery, 15 years at hard labor without benefit of parole, probation or suspension of sentence for the crime of aggravated crime against nature, and life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on the aggravated rape charge. The trial court ordered that the sentences be served consecutively.
The defendant now appeals from his convictions and sentences. For the following reasons, we affirm.

FACTS
On September 18, 1987, the 19-year-old female victim was working a 5 p.m. to midnight shift at a Monroe convenience store. At approximately 11:40 p.m., the victim noticed a small four-door car parked beside the building in front of the restrooms. The car appeared to be a dull yellow color.
A few minutes later, a customer, later identified as the defendant, entered the store and purchased a two-tablet package of Alka Seltzer and a styrofoam cup. The victim described the man as being a tall, black male who wore blue jeans and a Coca-Cola sweatshirt. The man told her he had an upset stomach, and he asked her for some water. The victim informed him that he could obtain water from the public restroom, which was located on the side of the building.
The man then obtained gasoline for his vehicle. This was the same car the victim had just seen near the restrooms and which had been moved to the area of the gasoline *776 pumps. The man came back into the store a second time to pay for the gasoline. He then returned to his vehicle and left at about 11:50 p.m. The victim testified that no one else was in the car with him.
The victim closed the store at midnight. As part of the procedure for closing the store, she made two trips to the public restroom outside to obtain three pitchers of water for the next day's coffee.[1] Her first trip to the restroom was about 10 to 15 minutes after the customer left. After the victim completed her paperwork and put the store's money bag in her purse, she set the burglar alarm and locked the store. She testified that she left at about 12:35 a.m.[2] After getting into her car, the victim drove over to the restrooms and parked. Instead of leaving the money bag (which contained at least $275.00 in cash and $30.00 in checks) and her purse in the car while she went to the restroom, she took these items with her.
When she approached the public restroom, she observed that the door was open several inches. As she reached for the doorknob, someone grabbed her and forced her into the dark restroom. She screamed once. Her assailant then threatened her several times, telling her to be quiet or he would cut her throat.
The assailant then turned on the bathroom light. The victim testified that she initially tried to avoid looking at him for fear he would kill her if he knew she could identify him. She took the money bag from her purse and gave it to the man. She testified that she assumed that the money bag was what he wanted, and she was not willing to fight him for it.
When the victim finally looked at the assailant, she recognized him as the customer who had been in the store twice that night. She observed a knife in his right hand. He demanded that she open the locked money bag, but the victim informed him that she did not have the key. He then put the bag down on the restroom counter and ordered the victim to disrobe and lie down on the restroom floor. The victim removed several articles of clothing and laid down on the floor. The assailant then turned the lights off and performed an act of oral sex upon the victim. He then turned the lights on and put on a condom. He turned the lights off again and engaged in sexual intercourse with the victim.
The assailant then turned the lights on and instructed the victim to dress. He also told the victim to stay in the restroom for 10 minutes. As he left with the money bag, he turned the lights off yet again but switched them back on in response to the victim's plea.
The victim waited in the restroom for about five minutes. She then got in her car and drove to another convenience store, from which she contacted the police. The first officer to arrive described the victim as crying hysterically.
When the police arrived at the crime scene, they discovered Rolaid antacid tablets and part of a Maalox tablet on the restroom counter. They also found a clear white plastic package on the floor.
The victim described her assailant to the police as wearing the same clothing that he had worn earlier in the evening in the store. In addition to blue jeans and the Coca-Cola shirt, she also described him as wearing a baseball cap and a fabric type belt. Subsequently, a composite drawing of the assailant was made by a police artist from the victim's description.
The authorities compiled two different photographic line-ups. The first was presented to the victim on September 22, 1987 and the second on October 2, 1987. The victim was unable to identify her assailant from the first line-up (which did not contain a photograph of the defendant). However, she picked out the defendant's photograph from the second line-up and *777 identified him as the customer in the store and her assailant.
On October 2, 1987, the defendant was arrested and charged with armed robbery, forcible rape, and aggravated crime against nature. On that same day, the police obtained a search warrant to search the defendant's gold colored, four-door Toyota automobile. Among the items found in the car pursuant to the search warrant were a tan pullover shirt with a Coca-Cola logo, a pair of blue pants, a blue baseball cap, a tan fabric belt, a black leather knife case, a styrofoam cup with a powdery white residue, an empty Alka Seltzer wrapper, and various medicines, including Evac-o-kwik and a partial roll of Maalox Plus tablets.
On December 3, 1987, the defendant was indicted for armed robbery, aggravated rape, and aggravated crime against nature.
On January 26, 1988, the defendant filed a motion to suppress the victim's identification of him on the grounds that the photographic line-up was suggestive. A hearing on this motion was held on February 8, 1988. Testifying at the hearing were the victim and two of the investigating officers, Sgt. Pat Willis and Deputy Roland Jones. Another deputy who was present when the victim identified the defendant in the photographic line-up also testified. The trial court denied the motion, finding that the line-up was not suggestive.
The defendant's trial was scheduled to begin on May 23, 1988. On the morning of trial, the defendant sought a continuance. A hearing was held pursuant to defense counsel's handwritten motion. The defendant contended that Barry Talton, who was an essential defense witness, had been subpoenaed by both the state and the defendant; however, he could not be located for service. It was alleged that Mr. Talton would testify that he had been with the defendant on the night of the offense and had observed the defendant at the convenience store. The motion was denied by the trial court, and the defendant's trial began as scheduled.
The state presented the testimony of the victim and various law enforcement officers. Among the officers who testified were Deputy Jones and Sgt. Willis, who investigated the crime; Deputy Artis Wilson, who secured the crime scene; Deputy Gary Carver, who was present when the defendant made a voluntary recorded statement to the police after his arrest; Sterlington Police Chief Paul Davis, who participated in the defendant's arrest; and Deputy Thomas Hargrove, who was the first officer to speak to the victim.
The tape recording of the defendant's statement to the police was played for the jury. In this statement, which was given to the police on the date of his arrest, the defendant stated that on September 18, 1987, he drove his friend Barry Talton to Monroe. On their way back to Sterlington, they stopped at the convenience store in question. The defendant stated that he bought gasoline, then some Alka Seltzer. He then went to the restroom before leaving. The defendant claimed that after he took Mr. Talton home, he arrived at his parents' home at about 9:30 p.m. and went to sleep.
The state also called a representative of the security firm that maintained the alarm system at the convenience store to establish the times the alarm system was turned on and off on the night of the offenses. The state also questioned two relatives of the defendant to establish that the defendant had left his car at another relative's house shortly after these offenses were committed.[3]
The defendant presented the testimony of alibi witness Kathy Cole, his former girlfriend. She testified that the defendant arrived at her house in Sterlington, Louisiana, between midnight and 12:20 a.m. on September 19, 1987. She testified that after she admitted the defendant into the house, they talked for a while and then retired. Ms. Cole testified that the defendant slept in her bed, and that she would have known if he had left the house thereafter. Ms. Cole testified that she was certain *778 of the date because the defendant gave her money with which to buy a birthday cake for a surprise party she gave that night. Another witness testified that Ms. Cole hosted a birthday party for her on the night of September 19, 1987.
The defense also presented the testimony of criminalist Linda Armstrong of the North Louisiana Crime Laboratory in West Monroe. She testified that she analyzed the contents of the rape kit used in the examination of the victim. Ms. Armstrong testified that seminal acid phosphatase and spermatazoa were present. She testified that in view of the alleged use of a condom by the rapist she found the presence of such residue unusual, but easily explained.
The jury found the defendant guilty as charged on the counts of aggravated rape and aggravated crime against nature. On the charge of armed robbery, the jury returned a responsive verdict of guilty of first degree robbery, in violation of LSA-R.S. 14:64.1.
On July 7, 1988, the defendant, through his court-appointed attorney, filed a motion styled "Motion For New Trial, For Post-Verdict Judgment of Acquittal and Arrest of Judgment." On October 18, 1988, an amended motion was filed by his newly retained private counsel. The defendant contended that the evidence presented at trial was insufficient to convict him. Furthermore, he alleged that Barry Talton had been located and was willing to testify on his behalf. In an affidavit attached to the amended motion, Mr. Talton stated that on September 19, 1987, the defendant was with him between 12:30 a.m. and 12:50 a.m. and could not have committed the offenses. A hearing on the motion was held on October 24, 1988. On October 28, 1988, the trial court denied the defendant's motion.
The trial court sentenced the defendant to 20 years at hard labor without benefit of parole, probation or suspension of sentence for the charge of first degree robbery; to 15 years at hard labor without benefit of parole, probation or suspension of sentence for the crime of aggravated crime against nature; and life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for the crime of aggravated rape. The trial court ordered that the sentences run consecutively.
The defendant appeals. He urges five assignments of error: (1) the trial court erred in denying the motion to suppress; (2) the trial court erred in denying the motion for continuance; (3) the trial court erred in denying the motion for new trial where an alibi witness who had been named in the motion for continuance had been located; (4) the trial court erred in refusing to grant the defendant's motion for a new trial where the verdict was contrary to the law and the evidence; and (5) the trial court erred in imposing an excessive sentence.

MOTION TO SUPPRESS
The defendant argues that the trial court erred in denying his motion to suppress the victim's identification of him as her assailant. He argues that the photographic line-up from which she identified him was suggestive.
A defendant attempting to suppress an identification must first show that the identification procedure was suggestive, and secondly, that there was a likelihood of misidentification by the eye witness. Even if the identification procedure was suggestive, the identification will be admissible, if, under the totality of the circumstances, it is found to be reliable. State v. Mims, 501 So.2d 962 (La.App. 2d Cir.1987); State v. Cotton, 511 So.2d 1207 (La.App. 2d Cir.1987).
Even if an identification procedure is suggestive, the identification will not be suppressed unless a likelihood of misidentification is shown. The factors considered in assessing the reliability of the identification include the opportunity of the witness to view the suspect at the time of the crime; the degree of attention paid by the witness during the commission of the crime; the accuracy of the witness' prior description; the level of certainty demonstrated at the identification; and the length of time elapsed between the crime and the *779 identification. Mims, supra; Cotton, supra.
Approximately three days after the commission of the offenses, the victim gave the police artist a description of her attacker as a black male in his late twenties to early thirties, about 6'2" in height, with a slender build and a light, blotchy complexion. She also described him as being light-bearded with the beard being mostly on his chin. He had a mustache and a short, wavy, Afro hairstyle. He had close set, wide open eyes.
On September 22, 1987, the police officers presented a photo lineup to the victim. This first lineup contained photographs of five black males, all of whom have similar hair styles and light blotchy complexions, with a small amount of facial hair. The second photographic line-up, which was presented to the victim on October 2, 1987, and from which she selected the defendant's photograph, showed five black males, all of whom had facial hair and had similar hair styles. There were sufficient similarities in the facial characteristics of the individuals to test the victim's identification.
The officers and the victim testified as to the presentation of the line-ups. The record reveals no taint of suggestiveness in the manner in which the lineups were assembled, nor in the manner in which they were presented to the victim.
Even if the line-up had been suggestive, the victim's identification of the defendant was highly reliable. The victim had the opportunity to view the suspect for approximately thirty minutes during the commission of the offenses. For one-third to one-half of this time, the lights in the restroom were on. Although the victim testified that she initially was reluctant to look at her assailant for fear that he would kill her, she did look at him after she had surrendered the money bag to him. The composite drawing which was drawn with the victim's cooperation displays a strong resemblence to the defendant. We also note that, when the victim was shown the line-up containing the defendant's photograph, she selected that photograph without hestitation. Furthermore, she made this identification only two weeks after the offenses.
We find no merit in this assignment of error.

MOTION FOR CONTINUANCE
The defendant argues that the trial court erred in denying his motion for a continuance. He maintains that he was not given ample time to locate witnesses, and that his court-appointed counsel did not have the opportunity to talk to a witness who was out of state on the date of trial. The defendant argues that the witness in question, Barry Talton, would have contradicted the testimony of the victim.
In defense counsel's hand written motion for continuance, the defendant asserted that Mr. Talton would testify that he was with the defendant on the night in question and that he observed the defendant at the scene of the offenses. Defense counsel alternatively stated that Mr. Talton would testify that he was uncertain of the date that he and the defendant stopped at the convenience store. The defendant's motion also alleged that Mr. Talton's testimony would vary from the recorded statement he gave to the police because he was "influenced" by the police, who allegedly advised him that he was also a suspect in the crimes. The defendant alleged that Mr. Talton was a Sterlington resident who was then in Texas. However, there was "no reason to believe that Mr. Talton has permanently moved to Texas and that he would not be subject to service in the Sterlington area at a future date."
The record reveals that on October 6, 1987, Mr. Talton gave a voluntary statement to Sgt. Willis and Deputy Jones. He stated that his girlfriend had given birth to his child on September 16, 1987. On the following day, September 17, the defendant drove Mr. Talton to Monroe in his gold, four-door Toyota. En route they did not stop anywhere. Mr. Talton did not see the defendant again that day after they parted company in Monroe. Mr. Talton did not see the defendant at all on September 18th.
*780 The only mention of a convenience store is Mr. Talton's statement that about a week before Mr. Talton's child was born, the defendant and Mr. Talton stopped at a Circle K convenience store, which both men entered.
LSA-C.Cr.P. Art. 709 provides:
A motion for continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
We find that the defendant failed to adequately satisfy the requirements of Article 709. At the hearing on the motion for continuance, defense counsel admitted that he had never spoken to Mr. Talton. Therefore, he could not possibly establish the facts to which he expected Mr. Talton to testify. This is particularly true in view of Mr. Talton's statement to the police that he and the defendant stopped at a different convenience store on a different date. Thus, defense counsel could do nothing more than speculate as to what he might hope Mr. Talton would state under oath. (Defense counsel obviously hoped that Mr. Talton would alter his previous statement and support the defendant's police statement describing his stop at the convenience store.)
Additionally, the defendant produced no facts showing a probability that the missing witness would be available to testify at a later date. Nor does the record adequately reflect that the defendant exercised due diligence in his efforts to procure the witness' attendance at trial. Although defense counsel was fully aware that Mr. Talton was mentioned in the defendant's statement to the police, he never spoke to the witness. He did not even seek to subpoena Mr. Talton until four days before trial. See State v. Clark, 437 So.2d 879 (La.App. 2d Cir.1983), writ denied 442 So.2d 460 (La.1983).
Based upon the foregoing, we find no error in the trial court's denial of the motion for continuance.
This assignment of error is meritless.

MOTION FOR NEW TRIAL

Location of Missing Witness
The defendant claims the trial court committed reversible error when it denied his motion for a new trial after Mr. Talton had been located. Attached to the defendant's motion for new trial was Mr. Talton's affidavit in which he stated that he was with the defendant on the night of the offenses between 12:30 and 12:50 a.m. and he had personal knowledge of the defendant's innocence. He also stated that on the date of the trial he was job hunting in Texas, that defendant's court-appointed counsel never contacted him, and that "the investigators who talked to him tried to put pressure on him when they were talking to him about the case." Mr. Talton also stated his willingness to testify on behalf of the defendant.
LSA-C.Cr.P. Art. 851 provides, in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever: ...
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty; ...
LSA-C.Cr.P. Art. 854 provides, in pertinent part:

*781 The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.
In a motion for new trial based upon the discovery of new and material evidence, the burden is on the defendant to show the new evidence was not discoverable prior to or during trial and that, if the evidence had been introduced at trial, the new evidence probably would have caused the trier of fact to reach a different verdict. In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. Furthermore, the trial court's denial of the motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Dickerson, 529 So.2d 434 (La.App. 1st Cir.1988), writ denied 533 So.2d 353 (La.1988).
The newly discovered whereabouts of Mr. Talton do not constitute "newly discovered evidence." Furthermore, even if it were, it is highly unlikely that his proposed testimony would have produced a verdict different from the one reached at trial. Mr. Talton's testimony, as currently portrayed by the defense, directly contradicts not only his own previous statement to the police, but also the testimony of defense witness Kathy Cole.
If Mr. Talton testified, he would be subject to impeachment by the State due to his prior statement to the police. In that statement, Mr. Talton said that on the night of September 18, 1987, he arrived home at 10:30 p.m. and did not go anywhere else that night.
Furthermore, Mr. Talton's affidavit also contradicts the testimony of Ms. Cole. She testified that the defendant had arrived at her house between midnight and 12:20 a.m. the morning of September 19th, where he remained. This testimony provided the defendant with a much stronger alibi than the possible testimony of Barry Talton. As early as October 7, 1987, she had told the police that the defendant arrived at her house during the night in question. She was listed as an alibi witness in the defendant's answer to the State's motion for discovery and inspection. In the answer, the defendant stated that at the time of the offenses he was either en route or already at his parents' home or Ms. Cole's home.
Had the defendant presented the testimony of Mr. Talton at trial, he would have provided the jury with two totally different and contradictory alibis, each of which was totally undermined by the other.[4] Therefore, we can find no error in the trial court's ruling that a new trial was not warranted.
We find this assignment of error to be without merit.

MOTION FOR NEW TRIAL

Sufficiency of Evidence
The defendant argues that the trial court erred in refusing to grant his motion for new trial on the grounds that his convictions were contrary to the law and evidence.
The defendant contends that the victim's identification of him as the offender was inadmissible and unreliable. We have previously considered this contention and found it to have no merit.
The defendant next contends that he should not have been found guilty of aggravated rape, as the evidence supports, at most, a conviction for forcible rape. In support of his argument that a conviction for aggravated rape was not warranted, the defendant relies upon a statement made by the victim at the hearing on the motion to suppress to the effect that, at some point, she had not felt that the assailant was going to hurt her.
However, we note that the defendant quoted the victim's statement out of context. *782 During the hearing she did testify that she was afraid the defendant was going to kill her. Additionally, in her trial testimony, the victim clearly indicated that the defendant's threats to cut her throat and his possession of a knife put her in fear for her life. The defendant made no attempt to impeach the victim's testimony at trial with the allegedly inconsistent prior statement.
Furthermore, the evidence showed that the defendant committed the offense of aggravated rape. At trial, the victim testified that she was frightened and complied with the defendant's demands due to her inability to escape from the restroom, the defendant's threats, and his possession of the dangerous weapon. She positively testified that she was in fear for her life as the defendant threatened to cut her throat. She saw a knife in the defendant's right hand. The armed defendant stood between the victim and the restroom door, her only possible means of escape. The victim's uncontradicted testimony at trial clearly showed that the presence of the knife put her in fear for her life and prevented her from resisting the defendant's attacks upon her person. This evidence showed that the victim did not lawfully consent to the sexual acts because she was prevented from resisting by threats of great and immediate bodily harm, accompanied by the apparent power of execution and because the defendant was armed with a dangerous weapon. LSA-R.S. 14:42(A)(2) and (3).
The defendant next argues that the evidence adduced at trial was legally insufficient to support his convictions. In reviewing the sufficiency of evidence to support a conviction, an appellate court in Louisiana is controlled by the standards pronounced by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Louisiana Legislature adopted these standards when it enacted LSA-C.Cr.P. Art. 821 which pertains to post-verdict motions for acquittal based on insufficiency of evidence. The standard enunciated in Art. 821 is that the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. Thomas, 460 So.2d 1069 (La.App. 2d Cir. 1984), writ denied 464 So.2d 1374 (La. 1985).
The evidence before the court establishes the defendant's guilt of all three offenses beyond a reasonable doubt. The victim positively identified him as both the customer who entered the store twice on the night of the offenses and who purchased Alka Seltzer and a styrofoam cup, and as the armed man who robbed her, raped her and committed aggravated crime against nature upon her. The evidence proved every essential element of the crimes of which the defendant was found guilty. The victim's identification of the defendant as the offender was corroborated. A search of the defendant's car, which bore a strong resemblence to the customer's car as described by the victim, revealed a Coca-Cola sweatshirt like the one worn by the customer/rapist. Also found in the car were a styrofoam cup and an empty Alka Seltzer package.
The evidence, considered in the light most favorable to the prosecution, demonstrates the defendant was guilty of the offenses in question.[5]
This assignment of error has no merit.

EXCESSIVE SENTENCE
In his final assignment of error, the defendant asserts that the sentences imposed by the trial court are excessive. He claims that his sentences amount to cruel, unusual and excessive punishment.
In determining whether a sentence is excessive, the test imposed by the reviewing court is two-pronged. First, the record must show that the trial court took cognizance of the factors set forth in LSA-C. *783 Cr.P. Art. 894.1 which enumerates criteria to consider in determining whether a sentence is excessive. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir. 1983), writ denied 439 So.2d 1074 (La.1983); State v. Tully, 430 So.2d 124 (La.App. 2d Cir.1983), writ denied 435 So.2d 438 (La. 1983).
While the trial court need not articulate every aggravating and mitigating circumstance outlined in LSA-C.Cr.P. Art. 894.1, the record must reflect that the court adequately considered those guidelines in particularizing the sentence to the defendant. State v. Smith, 433 So.2d 688 (La.1983); State v. Hammonds, supra; State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir. 1983), writ denied 438 So.2d 1112 (La.1983).
After determining whether the provisions of LSA-C.Cr.P. Art. 894.1 have been complied with by the trial court, the reviewing court must then determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant.
The sentencing court is given wide discretion in imposing a sentence within the statutory limits and such a sentence should not be set aside as excessive in the absence of a manifest abuse of discretion by the sentencing court. State v. Square, 433 So.2d 104 (La.1983); State v. Hammonds, supra; State v. Brooks, 431 So.2d 865 (La. App. 2d Cir.1983).
A sentence is unconstitutionally excessive in violation of La. Const. 1974 Art. 1, § 20 if the sentence is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980); State v. Cunningham, supra. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied 435 So.2d 433 (La.1983).
In selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions, but may properly review all prior criminal activity. State v. Palmer, 448 So.2d 765 (La.App. 2d Cir.1984), writ denied 452 So.2d 695 (La. 1984). As a general rule, maximum or near maximum sentences are to be reserved for the worst offenders and the worst offenses. State v. Lathers, 444 So.2d 96 (La.1983); State v. Telsee, 425 So.2d 1251 (La.1983); State v. Williams, 454 So.2d 1287 (La.App. 2d Cir.1984).
In imposing sentence upon the defendant, the trial court issued a written statement of its considerations. The trial court found that there were no mitigating factors in the defendant's favor. Additionally, a sentence of life imprisonment without benefit of parole, probation or suspension of sentence for aggravated rape was mandatory.
The trial court reviewed the defendant's prior criminal record. In 1980, he was arrested for possession of marijuana, but the charge was dismissed upon the defendant's successful completion of a drug abuse program. In 1982, the defendant was arrested for burglary of an automobile, but he pled guilty to misdemeanor theft. In addition to a fine, he was given a suspended sentence of six months in the parish jail and two years of supervised probation. However, his probation was revoked in November of 1983.
In 1984, the defendant was arrested on a charge of felony theft. He pled guilty to unauthorized use of a movable, and was fined $150.00 and costs, or, in default thereof, 60 days in the parish jail. A 1985 conviction of middle grade theft and illegal possession of stolen things resulted in concurrent sentences of, respectively, two years at hard labor and three years at hard labor.
On December 4, 1986, the defendant was paroled from prison. He was released from parole supervision on August 13, 1987, just one month and six days before the commission of the present offenses.
The trial court found that lesser sentences would deprecate the seriousness of these crimes. The trial court further found *784 that the 25-year-old defendant's behavior posed an extremely serious danger to the community and that the public's safety required an extended period of incarceration.
The defendant's conviction for aggravated rape carried a mandatory sentence of life imprisonment, without benefit of parole, probation or suspension of sentence. The defendant received the maximum penalty of 15 years at hard labor without benefit of parole, probation or suspension of sentence for the offense of aggravated crime against nature. He also received a sentence of 20 years at hard labor without benefit of parole, probation or suspension of sentence for first degree robbery, which carries a maximum exposure of 40 years without benefit of parole, probation or suspension of sentence.
In view of the seriousness of the defendant's unprovoked crimes against the 19-year-old victim, the defendant's prior criminal record, and the strong possibility that the defendant would commit other criminal acts, we find no error in the trial court's imposition of sentence.
This assignment of error is without merit.

CONCLUSION
For the reasons stated above, we affirm the convictions and sentences of the defendant.
AFFIRMED.
NOTES
[1] Next to the public restroom was a locked employees' restroom. However, the victim testified that she obtained water from the public restroom because unlocking the other door and carrying the water pitchers would have been too awkward.
[2] The security alarm company's records showed that the alarm was set at 12:32 a.m.
[3] Both of these witnesses initially denied giving the police information about the defendant's car, but were impeached by the state through the testimony of Deputy Jones.
[4] Arguably, Mr. Talton's testimony would have resulted in the presentation of three alibis to the jury. In his statement to the police, which was played for the jury, the defendant stated that he took Mr. Talton home before returning to his own parents' home at 9:30 p.m. and going to sleep.
[5] The defendant's conviction for first degree robbery instead of armed robbery was apparently a "compromise" verdict by the jury. We note that the evidence would have supported a conviction for armed robbery.