**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony ANTONINO,
Defendant-Appellant.**

**No. 86–2062.**

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1987.
Decided Oct. 2, 1987.

---

Richard S. Kling, Chicago, Ill., for defendant-appellant.

Lawrence E. Rosenthal, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The dispositive issue in this appeal is whether a delay of over three years between the dismissal of a criminal complaint charging various violations of the narcotics laws and the bringing of a subsequent indictment caused the defendant to suffer actual and substantial prejudice. To

show a violation of due process from pre-indictment delay that would require dismissal of the indictment, a defendant must show two things: that the government deliberately delayed bringing the indictment in order to gain a tactical advantage and that the delay caused defendant actual and substantial prejudice in presenting his defense. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2048, 52 L.Ed.2d 752 (1977). The district court denied defendant's motion to dismiss the indictment, holding that defendant failed to make a showing that he suffered actual and substantial prejudice from the loss of telephone records and of the notes of an FBI agent. We will affirm.

I

Anthony Antonino met in the Holiday Inn in LaSalle-Peru, Illinois, on January 15, 1982, with two men he knew only as Jerry and Larry from Tampa, Florida. Antonino had offered to buy a kilogram of cocaine. Jerry and Larry tendered the cocaine. When Antonino agreed to accept it, the "backup units and surveillance units" that Jerry and Larry had in reserve made themselves known and arrested Antonino. Jerry and Larry were in reality Sergeant Gerald Rademaker of the Tampa Police Vice Control Bureau and Special Agent Lowell Miller of the Drug Enforcement Agency.

Antonino, for his part, was a confidential informant who worked with the Federal Bureau of Investigation. Whether, in procuring the cocaine, he was acting in that capacity or for his own purposes became an issue at his subsequent trial. He was charged with conspiracy to possess and distribute cocaine and marijuana, attempted possession of cocaine with intent to distribute, possession of cocaine and marijuana with intent to distribute, and use of a telephone to further the conspiracy (see 21 U.S.C. §§ 841(a)(1), 843(b), and 846). Antonino testified that he bought the cocaine in order to use it to set up for arrest the "real" drug dealers in the LaSalle-Peru area. The jury convicted Antonino on all counts.

The indictment against Antonino had not been returned by the federal grand jury until May 21, 1985, some three and one-third years after his arrest. A complaint had been filed against him the day of his arrest. However, on February 3, 1982, the government moved to dismiss the complaint and on February 8, Magistrate Olga Jurco granted the motion.

Antonino contends that the delay of over three years between his arrest and indictment violated both his rights under the Sixth Amendment's Speedy Trial Clause and his due process rights. As discussed below, the first contention fails because his rights under the Speedy Trial Clause did not attach until he was indicted; the pre-indictment delay could therefore not infringe them. The due process contention fails because he did not show the requisite actual and substantial prejudice. To attempt to show prejudice, Antonino contends that evidence to support his defense was no longer available because of the delay. The lost evidence is said to be telephone records and the notes of his FBI contact. He argues that this evidence would have supported his contention that he sought to buy cocaine only in order to help the FBI arrest the "real" drug dealers in the area. We hold that Antonino has failed to make the requisite showing of actual and substantial prejudice.

Many of the facts in this case are undisputed. Some facts were disputed as we will note. Because the central issue involves whether the defense was prejudiced at trial by the unavailability of certain evidence, it is necessary to give facts in considerable detail.

In 1977, Antonino's meat shop was burgled. The FBI investigated the matter. Antonino mentioned to the investigating agent that he had received an offer to buy "a hot load of meat." Antonino agreed to give further information about illegal activity in the Spring Valley area. Spring Valley lies on Interstate 80, convenient to Chicago, Rock Island, Rockford, and Peoria. It is thus a throughpoint for transportation of both legal and illegal cargoes. Antonino testified that he had felt that by becoming an informant for the FBI, he could put himself on a par with some of his friends:

"a private detective and [ ] the sheriff and the state troupers [sic]."

Antonino's principal contact with the FBI was Special Agent David Hirtz. Antonino and Hirtz spoke often, usually on the telephone, often several times a day. Hirtz made notes in connection with about one-third of these conversations. He used the notes in the preparation of his memoranda; not all the information in the notes was used in the memoranda. Hirtz testified that he included only "personal criminal information" in the memoranda. Many telephone calls, some as long as half an hour, were not represented in the memoranda. After the indictment, Antonino filed a motion for the preservation of the notes. At some point after Antonino's arrest, but before his indictment, Hirtz had thrown the notes away. The memoranda were made available to the defense.

The other type of evidence lost to Antonino was telephone records. Antonino sought to subpoena records of calls from his telephones, those of his partner Rounds, and Hirtz. The parties stipulated at trial that the telephone company did not keep records older than two and one-half years.

Antonino provided information about various illegal matters, including fraud involving federal funds for snow removal, sale of stolen property, meat theft, and white collar crime. At the behest of the FBI, Antonino made it known among those interested that he could be of help in the trafficking of contraband. The FBI used information garnered through Antonino in its investigations. The FBI and Antonino agreed that he would not testify against the people he informed on. Antonino himself had never been arrested or charged with a crime. During part of the period in question here, he occupied the elective office of tax assessor.

At least once, with Hirtz's authorization, Antonino committed acts that, unauthorized, would have been considered crimes. Antonino offered his services to launder the proceeds of a million dollar insurance fraud and went so far as to receive the check, which he later turned over to the FBI.

Hirtz more than once informed Antonino that a confidential informant did not have license to flout the law: "I told him he is not to participate in acts of violence, he is not to use any unlawful techniques for the FBI to obtain information, he is not to initiate a plan to commit criminal acts, he is not to participate in criminal activities with persons under investigation other than those considered necessary by the FBI for purposes of obtaining information needed for federal prosecution."

Antonino also gave information to the FBI about narcotics activity. For instance, he gave information about drug smuggling from the Bahamas involving a certain "Silburn Melt." Another time, he informed Hirtz that a pound of cocaine could be found at the home of one Johnny Harris. He also gave Hirtz the names of various people in the area who he said were involved in the sale of narcotics. Hirtz and Antonino both testified that Antonino never informed the FBI that he himself was involved in any narcotics transactions. Antonino did tell Hirtz that he had been in the Bahamas and in Colombia, saying that he had been gathering information about narcotics smuggling. At this time, the FBI did not investigate narcotics crimes; this was within the bailiwick of the Drug Enforcement Administration (DEA).

William Rounds, an attorney, joined Antonino in running the meat business in 1981. Antonino testified that because he received so many telephone calls and visits at the shop from noncustomers, Rounds asked, "Who the hell are all of these people?" Antonino informed Rounds of his role as a confidential informant and solicited his aid. Antonino's daughter, who worked at the meat shop, was also alarmed by these "creepy" people, who gave only their first names, came into the shop with their shirts hanging open, and screamed and yelled at her father.

Antonino made three trips to the Bahamas, meeting with one Dale Baxter. Baxter testified that the trips had a dual purpose: to start up a lobster export business

and to buy cocaine. Baxter testified that Antonino once bought cocaine from a local dealer, Junior Johnson. Baxter also testified that Antonino, dissatisfied with the cocaine's quality, decided to find a new source. Baxter moved back to Illinois, partly because Antonino's refusal to pay the balance of the sum owing on the cocaine made it somewhat uncomfortable for Baxter in the Bahamas.

Baxter further testified to the following: in April of 1981, Antonino and Rounds dispatched him to Tampa with $6,500 in one hundred dollar bills to buy two kilograms of cocaine for them. On arriving in Tampa, Baxter called a number given him by Antonino and Rounds. "Eugene" came to his motel and took him to meet with Jerry and Larry. Eugene was an informer for the DEA. As directed by Antonino, Baxter tested the proffered cocaine by rubbing some on his gums, which duly turned numb. Baxter then displayed the money. Jerry and Larry expressed great surprise at the sum, which was less than one tenth the going rate. Baxter immediately phoned Antonino, who told him to come home.

Antonino soon sent Baxter down again with $2,500. Eugene came to Baxter's room and took the money, saying he would be back later. Baxter never saw him again. Baxter waited for a day and flew home again.

Jerry (Sergeant Rademaker) telephoned Antonino, having realized that Eugene was not a reliable go-between. The two had frequent conversations in the following months. During these talks, Antonino showed himself versed in the jargon of drugs, correctly using such locutions as "points" (the percentage purity of cocaine), "freebase" (smoking cocaine), "cut" (adding another white powder to the cocaine to increase the volume and thus make more to sell), "leave room" (selling drugs sufficiently pure that the next link in the distribution chain can also "cut" the cocaine).

On June 16, 1981, Antonino met with Hirtz and another FBI agent. Antonino was again advised that he could go to jail if he committed unauthorized criminal acts.

Hirtz testified that Antonino did not mention that he had sent Baxter to Tampa to buy cocaine or that he had spoken by telephone that morning with Jerry and Larry and expected them to arrive in Illinois the next day for further discussions on the subject. Antonino testified that he said "that there are some people that came from Florida that was around talking about drugs and other things besides that." He testified also to saying Baxter had been to Florida and seen two kilograms of cocaine belonging to Eugene.

Jerry and Larry arrived as expected. Antonino met them at the airport. Over the next two days, Antonino introduced them to various potential clients and paid their hotel and meal bills.

On June 29, 1981, Hirtz learned through another FBI agent that Antonino was seeking to buy cocaine from Jerry and Larry. Although the FBI regularly reimbursed Antonino for his investigation-related expenses, Antonino never sought reimbursement for the Bahamas or Tampa trips.

On July 23, 1981, Antonino told Hirtz that he wished to "lay it all out about narcotics." On September 9, 1981, Hirtz, Antonino, and an agent of the DEA met for about three hours. Antonino gave voluminous information about drug trafficking. Hirtz testified that he was paying particular attention to see if Antonino said anything about his Tampa connections and Antonino did not. Antonino testified that he informed them at the meeting that two fellows from Florida who worked with Eugene had visited and that he had shown them around. Hirtz testified that he took no notes at this meeting because drug investigations were not within the jurisdiction of the FBI; the DEA agent testified to taking no notes because he decided Antonino was lying and his information was valueless. Antonino testified that Hirtz and the DEA agent took notes.

Hirtz also testified that on August 18, 1981, he asked Antonino point blank if he was involved in any drug transactions and Antonino said, "I haven't done nothing and I am clean now."

Meanwhile Antonino's telephone conversations with Rademaker continued. At trial the government produced tape recordings of telephone calls in which Antonino sought to buy cocaine and marijuana from Rademaker.

On December 23, 1981, after the two had not spoken for three months, Rademaker called Antonino. A deal was struck whereby Antonino would pay $25,000, receive one kilogram of cocaine, and pay the balance, some $28,000, within a week. On December 30, Antonino informed Rademaker that he would like to buy three to five kilograms of cocaine per month.

Antonino telephoned Rademaker on January 11, 1982, and said that Richard McKee would be coming down with the money. He spoke afterwards with Hirtz on the telephone. According to Hirtz, Antonino did not mention anything of the Tampa deal. Antonino testified that, immediately after talking to Rademaker, he told Hirtz that he had set up a deal to take the real drug dealers in Spring Valley "off the street" and that the deal was "all ready to go down." He did not claim to have informed Hirtz of anything more specific about the deal.

Antonino and Hirtz both testified that they agreed to meet on the 14th or 15th, a meeting that did not take place. Hirtz testified that the sole purpose was to discuss reimbursement for Antonino's expenses. Antonino testified that Hirtz said that at the meeting they would "get you reimbursemented [sic] and then set up the meeting on the drugs."

On January 13, Antonino called Rademaker and told him to expect McKee at the Tampa Holiday Inn that afternoon. Antonino called again later to say that McKee had arrived. Rademaker and Miller, as Jerry and Larry, went to McKee's room with a kilogram of cocaine and a scale. McKee had directions from Antonino to test the cocaine on his gums, call Antonino, and return to Chicago with the cocaine taped to his body. He was to receive $2,000 for his work. McKee sampled the cocaine, called Antonino, and offered the money. Jerry and Larry arrested McKee. He agreed to aid the investigation.

The next day, January 14, McKee called Antonino to tell him that Jerry and Larry would return to Chicago with him. Once in the Spring Valley area, McKee called Rounds. Rademaker told Rounds that they wished to consummate the deal in person. The reasons he gave were that McKee was too nervous and that they wished to straighten out certain deals to ensure that they would receive the $28,000 balance. Rounds put him off until the next day.

Antonino twice tried to call Hirtz at about this time. Hirtz testified that he received messages that Antonino had tried to reach him twice on January 14, the first time saying he would try again later, the second time saying that he would try again the next day (Friday the 15th) and if unsuccessful, Monday the 17th. Antonino testified that he tried once on January 14 and once January 15, before the climactic meeting with Jerry and Larry.

On the morning of January 15, Antonino and Rounds met with Jerry and Larry at the LaSalle-Peru Holiday Inn. Antonino testified that he planned to take the cocaine and put it in the meat store safe until he could turn it over to Hirtz. He also testified that he knew that Jerry was a cop because Eugene, while seeking his cooperation in other drug transactions, had told him, "Stay away from Jerry because he is a cop." Whether Jerry was now acting as a cop or was corrupt, Antonino testified, he neither knew nor cared. He did not reveal that he was an FBI informant.

Antonino, Rounds and the twosome from Tampa briefly discussed the substance that Antonino would use to "cut" the cocaine. Then, both Antonino and Rademaker testified, Antonino tested the cocaine: they disagreed about the method he used. Rademaker testified that Antonino cut the bag containing the cocaine with the pop top from a Coke can, formed two lines of cocaine on the table, ingested one line into each nostril through a rolled-up dollar bill, and jokingly offered to pay for the cocaine with the dollar bill. According to Antonino, he never used drugs and simply stuck

some of the cocaine between his cheek and gum with his finger: "I never snorted no coke in front of no cops, sir."

Antonino agreed to buy the cocaine. He and Rounds were promptly placed under arrest. A complaint was filed against them that day but dismissed at the behest of the government on February 8. They were indicted on May 21, 1985. Defendants moved to dismiss the indictments on the basis that the pre-indictment delay violated their rights both to a speedy trial under the Sixth Amendment and to a fair trial under the due process clause. The trial court denied the motions. The joint trial began January 23, 1986. The jury found Antonino and Rounds guilty on all counts.

## II

■ The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." A defendant's rights under the Speedy Trial Clause attach with indictment or with "actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). The Supreme Court recently held that where an individual is indicted, the indictment is dismissed, and later the individual is reindicted, the speedy trial rights do not attach while the individual is not under indictment. *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). Similarly, the rights do not attach during the period between the dismissal of military charges and the filing of a subsequent civilian criminal indictment. *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). "[T]he Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause." *Id.* at 7, 102 S.Ct. at 1501. *See also United States v. Jones,* 808 F.2d 561, 567 (7th Cir.1986).

■ Antonino does not contend that the government did not act in good faith in dismissing the complaint against him. He seeks instead to avoid the rule of *MacDonald* and *Loud Hawk* by arguing that they are inapplicable simply because of the length of the delay between dismissal of the complaint and the subsequent indictment in this case, over three years. But in *MacDonald* over four years passed between the dismissal of the military charges and the filing of the civilian indictment. In *Loud Hawk,* too, about four years passed between dismissal of the indictment and the reindictment. As in those cases, the Speedy Trial Clause is inapplicable to the period in this case between dismissal of the complaint and filing of the indictment.

■ The primary safeguard against governmental delay resulting in prosecution of stale criminal charges is the applicable statute of limitations. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) (citing *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971)). The statute of limitations does not, however, provide a safe harbor for the prosecutor; he may not delay prosecution simply to gain a tactical advantage in the case. *Id.* "[T]he Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." *United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984) (citing *Lovasco* ).

■ In the overwhelming majority of cases in which defendants have raised the issue of pre-indictment delay, the courts have held that the showing necessary to require dismissal of charges has not been made. This court has considered the issue a number of times and not found the showing made. *See United States v. Perry,* 815 F.2d 1100 (7th Cir.1987); *United States v. Jones,* 808 F.2d 561 (7th Cir.1986); *United States v. Brock,* 782 F.2d 1442 (7th Cir. 1986); *United States v. Brown,* 742 F.2d

359 (7th Cir.1984); *United States v. Williams*, 738 F.2d 172 (7th Cir.1984); *United States v. Watkins*, 709 F.2d 475 (1983). In most of these cases, we held that the defendant failed to show that the delay caused actual and substantial prejudice to the presentation of his defense. We have not defined exactly what would suffice to show the requisite level of prejudice. However, we do have several examples of insufficient showings. The mere passage of time without more is not sufficient. *Perry*, 815 F.2d at 1103 (citing *Brock, Williams, Watkins,* and *Solomon*); *see also United States v. Helmich*, 521 F.Supp. 1246 (M.D.Fla.1981) (no showing that seventeen year delay caused actual prejudice). To show the necessary "high degree of prejudice," it was not enough that a nineteen-month delay permitted defendant's "borderline personality disorder" and "organic personality syndrome" to worsen, making it more difficult for him to testify in his own behalf. *Perry*, 815 F.2d at 1103–04.

■ The most common stumbling block for defendants has been the requirement that in order to show actual prejudice they point quite specifically to how they were prejudiced; the defendant's showing must be concrete, not speculative. Thus, actual prejudice was not shown by the fact that two potential witnesses died during the pre-indictment delay, where the defendant made only general allegations of prejudice. *Solomon*, 688 F.2d at 1179. Nor was it enough to claim that the delay made it impossible to credibly reconstruct events, where the defendant alleged no specific prejudice. *Watkins*, 709 F.2d at 475. Similarly insufficient was defendant's claim that his memory may have faded. *Brock*, 782 F.2d at 1444. A defendant must do more than allege that a particular witness is no longer available and that the witness's testimony would have helped the defense. *Brown*, 742 F.2d at 362. "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice." *Id.* (*quoting United States v. Jenkins*, 701 F.2d 850, 855 (10th Cir.1983)). *See also*

*Jones*, 808 F.2d at 567 ("Mr. Jones fails to specify exactly what Mr. Wilkins' testimony would have been, why he was unavailable, or in what sense the others' memories had faded.").

A case very like the present one is *United States v. Williams*, 738 F.2d 172 (7th Cir.1984). Williams and Vervlied had been convicted of mail fraud. Undisputed evidence showed that Vervlied had sold several automobiles to an FBI undercover agent and had referred to them as "insurance cars." One of the cars belonged to Williams. Several days after the sale, Williams reported to police that his car had just been stolen. He also reported the loss to his insurance company, which paid his claim.

■ The central issue at trial was whether Williams was a knowing participant in a scheme to defraud the insurance company. The government argued that Williams had given the car to Vervlied, knowing that he would sell it, and then falsely reported that it had been stolen. Williams' theory, supported by Vervlied's testimony, was that Williams had entrusted the car to a mechanic, "Whiskey Bob" Berrant, who, rather than repairing the car, had sold it to Vervlied and told Williams that it had been stolen. Williams admitted that he lied about when the car was stolen and from whom, but said that he had done so only because he thought he would not recover his loss if the car was reported stolen from Whiskey Bob's possession. He denied knowing Vervlied or participating in the scheme.

Williams was not indicted until nearly four years after the events in question. By this time, Whiskey Bob was unavailable to testify: he was dead. Williams contended that the pre-indictment delay constituted a violation of his due process right to a fair trial.

We noted initially that "[t]he question of prejudice to appellant's defense due to the death of Berrant is inextricably related to whose version of events is believed." 738 F.2d at 175. Williams contended that Whiskey Bob had had the knowledge to

806

testify that Williams was simply an unknowing victim. The government contended that Whiskey Bob was "a conveniently unavailable scapegoat around whom appellant and Vervlied have fabricated a story to exculpate themselves from federal mail fraud charges." 738 F.2d at 176.

We evaluated the showing that Williams had made, to determine if it showed actual and substantial prejudice. There was no independent evidence that Williams had given Whiskey Bob the car to repair or even that Williams had known him. Also, the defense did not mention Whiskey Bob until the proceedings were quite advanced. We held that the showing made was insufficient. "Even if we accepted appellant's version of events, Berrant's death and consequent inability to testify on appellant's behalf would have prejudiced appellant's case only if we are convinced that Berrant would have testified, that his testimony would have withstood cross-examination, and that the jury would have found Berrant a credible witness despite his apparently well-earned nickname. In the absence of other evidence tending to support these possibilities, we would merely be piling speculation upon speculation to reach a finding of actual and substantial prejudice here, and this we cannot do." 738 F.2d at 176.

"Piling speculation upon speculation" aptly describes what Antonino asks us to do in this case. FBI agent Hirtz threw away his handwritten notes. Antonino contends that material was thereby lost that would have corroborated his testimony. But he failed to show that such corroboration was likely to be found in the discarded notes.

Antonino himself does not claim that he told Hirtz anything very specific about the impending deal. In regard to Jerry and Larry's first, exploratory visit, Antonino claimed to have told Hirtz that some people from Florida were around talking about drugs. He claimed also to have told Hirtz that Baxter had been to Florida and had seen two kilograms of cocaine belonging to Eugene; Antonino did not claim to have told him that Baxter went on his behest

and that he met with Jerry and Larry. Finally, Antonino testified that shortly before the final deal he told Hirtz that he had set up a deal to take the real drug dealers off the streets.

For Antonino to have been prejudiced by the loss of the notes, it must be true first that, contrary to Hirtz's testimony, Antonino did tell Hirtz certain things about his dealings with Jerry and Larry and second that Hirtz made notes on such information but did not include this information in his more formal memoranda. Antonino proffered no evidence independent of his own testimony that supports this possibility.

In this case, as in *Williams*, if the evidence that defendant claimed was lost was indeed lost, the defense would have been harmed. Had Whiskey Bob testified credibly that he was the real culprit, Williams would have had a stronger case; were there notes made by Hirtz saying "Antonino informed me that he had set up a deal to ensnare the real drug dealers in this area," Antonino's contention at trial that he did not possess the cocaine with intention to distribute would have been stronger. But here, as there, there is little to show that such evidence existed. In each case, the only showing that such evidence might exist was the uncorroborated testimony of the defendant.

Proving the existence of lost evidence is by definition a difficult task. But some showing must be required; to take an extreme example, a defendant could not simply say "Eight bishops would have sworn that on the night of the killing I was with them. But now they are gone." Just what kind of showing would suffice, we do not in this case essay to determine. We hold only that the showing made here was clearly not enough. *Cf. United States v. Rogers*, 722 F.2d 557, 561–62 (9th Cir.1983) (no actual prejudice shown by destruction of bankruptcy court reporter's notes, where defendant alleged that notes might have corroborated his testimony), *cert. denied*, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).

Antonino also contends that the loss of the telephone records and notes undercut

his contention that he was in contact with narcotics dealers in the area and that he gave Hirtz information about these people. The telephone records could only have shown how often and at what times Antonino spoke with the dealers and with Hirtz. The records would, of course, not reflect the contents of the conversations. It was undisputed, however, that Antonino was in contact with many people in the drug business in the Spring Valley area and that he provided names to Hirtz. He failed to articulate any specific reason why more detailed information could have made his case stronger.

### III

For the reasons stated, the judgment of the district court is

AFFIRMED.