UNITED STATES of America, Plaintiff–Appellee,

v.

Sherman NICHOLS, Defendant–Appellant.

No. 90–2398.

United States Court of Appeals, Seventh Circuit.

Argued June 18, 1991.

Decided July 23, 1991.

Rehearing and Rehearing En Banc Denied Sept. 11, 1991.

John F. Hartmann, Brian W. Blanchard, Crim. Div., Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Sheldon Nagelberg, Michael B. Nash, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

A jury found Sherman Nichols guilty of: 1) use of a firearm in relation to a drug-trafficking crime, 18 U.S.C. § 924(c); 2) possession of cocaine, 21 U.S.C. § 841(a)(1); and 3) possession of a firearm by one previously convicted of a felony. 18 U.S.C. § 922(g)(1). He was sentenced to 20 years in prison. In this direct criminal appeal, Nichols challenges his conviction.

## I. BACKGROUND

### A. Facts

On the evening of March 11, 1989, two plainclothes police officers received a call regarding a man with a gun at 2447 East 79th Street in Chicago. As they approached that building, the officers observed a man and a woman speaking to each other in the doorway—the man had a gun with a wooden handle protruding from the waistband of his pants. When the officers identified themselves as the police, the man ran into the building and up some stairs, entered an open apartment, and slammed the door shut. The officers broke down the door, ran down the hallway, and found Nichols in the kitchen. One officer testified that he saw Nichols with his arm through the burglar bars and heard a "thud." The other officer testified that he saw Nichols drop the gun through the bars. The officers found a loaded Smith & Wesson .357 Magnum blue steel revolver with a wooden handle on the back porch.

The officers arrested and searched Nichols. They found a leather pouch strapped around his waist containing a plastic Tylenol bottle with nine individually wrapped tin foil packets of a mixture of low purity cocaine weighing a total of .83 grams. They also found $605 in five, ten, and twenty dollar bills.

### B. Procedural History

Nichols has been in custody since his arrest. After the local charges against him were dismissed, he was immediately arrested by the United States Marshals. A federal indictment was returned on December 6, 1989 on the charge of possession of a firearm by a previously convicted felon. Nichols was tried on that count on February 7, 1990. A mistrial was declared when the jury was deadlocked in an eleven to one split in favor of finding Nichols guilty. The government then brought a superseding indictment in which it added two more charges: possession of cocaine and use of a firearm in drug trafficking. On April 6, 1990, a jury found Nichols guilty of all three charges.

Nichols moved for a new trial on the basis of discrimination in the jury selection on April 18, 1990. The court denied his motion. Nichols then asked the court to reconsider that denial until a transcript of

the jury selection could be procured. On May 31, 1990, the court heard further argument on the merits of the motion for a new trial, which it denied on the same day.

On appeal Nichols contends that he was denied due process by: 1) the government's delay in charging him; 2) the government's bringing additional charges in retaliation for his exercising his right to a trial; and 3) the government's exercise of its peremptory challenges to eliminate all black females from the jury.

## II. ANALYSIS

### A. Delay in the Charge

■ The government did not charge Nichols for almost nine months after the events in question occurred. The superseding indictment was brought more than 11 months after his arrest. Nichols argues that the delay in charging him denied him due process by preventing him from effectively defending himself and by giving the government a tactical advantage. Nichols failed to raise this argument before the district court and thus has waived it on appeal. *See* Fed.R.Crim.P. 12(b)(1) (objections to untimely prosecution are to be brought before trial by motion). This court may review this issue only if Nichols establishes that the government committed plain error in failing to bring charges at an earlier date. Fed.R.Crim.P. 52(b); *see also United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982) (appellate courts may correct "particularly egregious errors"). There is plain error where a conviction results when, but for the error, the defendant would have been acquitted. *United States v. Felton*, 908 F.2d 186, 188 (7th Cir.1990).

■ Although a statute of limitations is the primary guarantee against prosecutorial delay, the due process clause also plays a limited role in protecting defendants against "oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). To determine whether the due process clause requires the dismissal of an indictment on the basis of undue pre-indictment delay, a court

must engage in a two-step inquiry: 1) the defendant must prove actual and substantial prejudice; and 2) the court must weigh the prejudice to the defendant against the reasons for the delay. *United States v. Antonino*, 830 F.2d 798, 804 (7th Cir.1987). The mere passage of time in itself is not enough to show prejudice. *United States v. Perry*, 815 F.2d 1100, 1103 (7th Cir.1987).

■ At the time of Nichols' arrest, there were three or four other people in the apartment. They were patted down to make sure that they had no guns. An officer testified that he had other officers interview those people, but there are no police records of any interviews or of the identity of the individuals. Nichols' defense was that the gun was not his and that it was there before he entered the apartment. Nichols argues that the delay between the arrest and the indictment prejudiced him because he had no opportunity to locate, interview, and subpoena the individuals who were at the apartment at the time of his arrest. He further argues that the failure on the part of the Chicago police to memorialize the identification and prospective testimony of these people created a presumption that their testimony would have been favorable to Nichols. *See United States v. Mahone*, 537 F.2d 922, 926 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976) (citing *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893)).

In support of his contention, Nichols cites a case that this court remanded because the investigation by the Chicago police was so "sloppy" that, by the time the federal authorities took the case, "it was too late to conduct a reasonable investigation." *United States v. Morales*, 902 F.2d 604, 607 (7th Cir.), *amended on other grounds*, 910 F.2d 467 (1990). There, too, the Chicago police followed a man into a building, found a gun, and charged him with possessing a firearm. There, too, the defendant denied that he had put the gun there. However, that is where the comparison ends. The issue in *Morales* was sufficiency of the evidence. The issue here is

pre-indictment delay, and prejudice caused by such delay is difficult to prove.

■ A defendant's showing of prejudice must be "concrete, not speculative." *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir.1989). Nichols does not know who those people in the apartment were. He does not know whether they lived there or whether they had been there for just a few minutes before he arrived. Nor does he know if any of them would have testified that the gun was on the back porch before he arrived. While it is true that it would have been useful had the Chicago police kept a record of its interview with these potential witnesses, "[a] defendant must do more than allege that a particular witness is no longer available and that the witness's testimony would have helped the defense." *Antonino*, 830 F.2d at 895. There is no way of knowing if those present in the apartment would have presented exculpatory testimony, would have withstood cross-examination, or would have been found credible by the jury. *Doerr*, 886 F.2d at 964. Nichols has failed to make the requisite showing of actual and substantial prejudice and, consequently, has not shown plain error.

### B.  Retaliation

■ Nichols also argues that the government's superseding indictment after the mistrial was an act of retaliation for Nichols' not having been convicted the first time around. Because Nichols did not object to the superseding indictment or raise the issue of prosecutorial vindictiveness below, he has also waived this issue on appeal. *United States v. Whaley*, 830 F.2d 1469, 1475 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) (citing Fed.R.Crim.P. 12(b)(1), (f)). An exception to the waiver rule is where "exceptional circumstances demand more flexibility." *Id.* at 1476. The threat of a much greater penalty is an "exceptional circumstance" that warrants appellate review of the possibility of a vindictive mo-

tive in bringing the new indictment, but under a plain error analysis. *Id.* Here, Count Two of the superseding indictment required a mandatory increased sentence of five years consecutive to the sentence imposed on Count Three.[1]

■ Due process prohibits vindictiveness against a defendant for having exerted his constitutional rights. *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969). There is a presumption of vindictiveness when the prosecutor brings a superseding indictment with increased charges after a defendant has exercised his right to a trial *de novo*. *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974). However, this presumption does not apply in the pretrial setting, where the prosecutor has broad discretion in charging a defendant. *United States v. Goodwin*, 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982). To show vindictiveness at the pretrial stage, the defendant must establish that the prosecutor was motivated by actual vindictiveness when he increased the charge. *See Wasman v. United States*, 468 U.S. 559, 568, 104 S.Ct. 3217, 3222–23, 82 L.Ed.2d 424 (1984). Examples of actual vindictiveness are where the prosecutor has a personal stake in the case or seeks "self-vindication" or where the additional charges were brought in order to persuade the defendant to enter a guilty plea. *Whaley*, 830 F.2d at 1479–80.

■ In a similar case, this court determined that when a mistrial is declared because of a deadlocked jury, there is no realistic likelihood of vindictiveness. *Id.* at 1479. Consequently, the pretrial standard of no presumption of vindictiveness applies. *Id.* Nichols must, therefore, establish actual vindictiveness by objective evidence that the prosecutor brought the superseding indictment in order to penalize him for "standing on his legal rights." *Id.* Nichols does not allege actual vindictiveness,

---

**1.** Noting that the government did not initially intend to bring the drug charge that resulted in Nichols' being classified as a career offender, the trial judge implemented a downward depar-

ture because "the guidelines overstate Nichols' criminal history [and] the seriousness of [his] offense." Opinion and Order of June 14, 1990 740 F.Supp. 1332, 1336.

nor does the record support such a claim. There is no plain error.

### C. Jury Selection

Nichols, who is black, argues that he was denied due process when the government exercised its peremptory challenges to exclude all black females from the jury. He asserts that the government's reasons for the strikes were not legitimate, but rather were pretexts for purposeful discrimination.

The Supreme Court has held that the equal protection clause of the fourteenth amendment prohibits the use of peremptory challenges by the state to exclude blacks from the petit jury. *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 1716–17, 90 L.Ed.2d 69 (1986). It is through the due process clause of the fifth amendment that this prohibition extends to the federal government. *United States v. Williams*, 934 F.2d 847, 849 n. 1 (7th Cir.1991).

■■■ The defendant, who ultimately bears the burden of establishing a discriminatory animus, *Hernandez v. New York*, — U.S. —, —, 111 S.Ct. 1859, 1873–75, 114 L.Ed.2d 395 (1991) (O'Connor, J., concurring), makes a *prima facie* case of purposeful discrimination in the selection of the petit jury by presenting facts and relevant circumstances that raise an inference that the government used the peremptory challenges in order to exclude venire members because of their race. *See Edmonson v. Leesville Concrete Co., Inc.*, — U.S. —, —, 111 S.Ct. 2077, —, 114 L.Ed.2d 660 (1991) (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–23); *Powers v. Ohio*, — U.S. —, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). The burden then shifts to the government to articulate a neutral reason for the exclusion. *Batson*, 476 U.S. at 94, 106 S.Ct. at 1721–22. While the government's explanation "need not rise to the level justifying exercise of a challenge for cause … [the government's counsel may not] rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selec-

tions.'" *Id.* at 97–98, 106 S.Ct. at 1723–24 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). Rather, the government's explanation for the challenges must be clear and reasonably specific, presenting legitimate reasons that are related to the particular case. *United States v. Briscoe*, 896 F.2d 1476, 1487 (7th Cir.), *cert. denied*, *Usman v. United States*, — U.S. —, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). The trial court must then determine whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1723–24. An appellate court will overturn a trial court's finding on the issue of discriminatory intent only if it is clearly erroneous. *Hernandez*, — U.S. at —, 111 S.Ct. at 1871–73.

■■ Nichols argues that because the three excluded jurors were black women, the government's exercise of its peremptory challenges was motivated by both race and gender discrimination. Nichols relies on a recent Supreme Court decision to say that, as a man, he can raise the issue of the exclusion of black women on the jury. *Powers*, — U.S. at —, 111 S.Ct. at 1370 (extending the protection of *Batson* to defendants who are not of the same race as the excluded juror). Nichols is inviting this court to expand the *Powers* holding to encompass the use of peremptory challenges on the basis of gender discrimination as well as to recognize black women as a discrete group cognizable under *Batson*. In declining Nichols' invitation, we note that Nichols does not argue that the government was discriminating against all women in its use of peremptory strikes, but rather that it was discriminating against black women. More importantly, *Batson* itself only "require[s] trial courts to be sensitive to the racially discriminatory use of peremptory challenges." *Batson*, 476 U.S. at 99, 106 S.Ct. at 1724–25. Therefore, our inquiry is limited to the question of racial discrimination.

Here, the venire consisted of 37 persons, eight of whom were black. Three black

men were empaneled on the jury.[2] The government exercised four of its seven peremptory challenges to exclude the four black women on the venire.[3] Nichols objected to each of these strikes, noting that his only witness was a black woman and that the government's witnesses were white. Nichols added that there was speculation that the juror who was responsible for the hung jury in the first trial was a black woman. After each of Nichols' objections, the trial judge turned to the government for its response.

The government explained that it challenged Karen Finley because "she is a young, single female with a minor dependent, no indication [she was] married, and therefore some questionable family background." The government struck a white woman, Susan Nowak, for the same reason. The government stated that it "prefer[red] not having young, single women with questionable family backgrounds." The government compared these two women with a white woman, Kristin Christy, whom it did not strike for two reasons: 1) she lived with her parents and thus had a more stable family background; and 2) her father is a United States postal employee, and the government favorably views family members who are government employees.

The government challenged Bridget Clark because she is a young, single female "living in questionable circumstances," that is to say, unmarried with her fiance. The government reiterated its position that it was looking for stable individuals with either a stable family background or who live alone.

Leslie Macon, the third questioned challenge, works for the United States Post Office and has a cousin who works for the Illinois State Police. However, she also lives with her fiance. In response to Nichols' objection to the government's use of a peremptory challenge to strike Macon, the government pointed out that it had struck two venire members with prior criminal arrest records and stated that it struck Macon (who did not have an arrest record) because she is not living within the confines of the law by cohabitating with a man. The government stated that "we are looking for people who abide by the law [and that whether laws are enforced or not] it shows a predilection or a purpose to do what they think is right, not necessarily what the law provides." Nichols' counsel responded that living common law with another person is not in violation of Illinois law.

The district court overruled all of Nichols' objections to the government's use of peremptory challenges against the three black women. The district court found that the government had stated an "articulable reason" that was sufficient under *Batson.* The district court maintained this position in denying Nichols' motion for a retrial and found that the transcript of the voir dire supported the reasons that the government proffered for the exercise of its peremptory challenges.

Nichols argues that the government's reasons were pretextual. Although the government stated that it looked favorably on jurors who had family members that are government employees, it struck Macon, a black woman, who not only was a government employee herself, but who also has a cousin who is a government employee. While two similarly situated black women were struck because their family backgrounds were non-traditional, the third was grouped with jurors with prior criminal arrests. Furthermore, the reason given for one challenge was clearly a misstatement of the law. As Nichols notes, as of January 1, 1990, cohabitation is no longer criminal in Illinois. ILL.ANN.STAT. ch. 38, para. 11–8 (Smith–Hurd Supp.1990).[4]

---

**2.** One black man was struck for cause.

**3.** On appeal, Nichols is not pressing his *Batson* claim with respect to Marion Millner, who admitted discharging a firearm in a confrontation with another individual.

**4.** The fornication statute used to read in relevant part: "Any person who cohabits or has sexual intercourse with another not his spouse commits fornication if the behavior is open and notorious." Public Act 86–490 deleted the words "cohabits or." 1989 Ill. Laws 86–490 (effective Jan. 1, 1990).

In support of the legitimacy of its proffered reasons, the government notes that: 1) three of the eight blacks on the venire were eventually seated; 2) the government still had three peremptory challenges available after those three blacks were seated; and 3) courts in this circuit and others have held that both age and marital status are legitimate reasons for the exercise of peremptory challenges under *Batson. See e.g., Williams*, 934 F.2d at 849–50 (young, single mother); *United States v. Mitchell*, 886 F.2d 667, 673 (4th Cir.1989) (young); *United States v. Moreno*, 878 F.2d 817, 820–21 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989) (young, single, unemployed, and inexperienced); *United States v. Ross*, 872 F.2d 249, 250 (8th Cir.1989) (young, single female, unemployed and lacking in education); *United States v. Clemons*, 843 F.2d 741, 748 (3d Cir.1988) (young and single).

We find that the government articulated neutral reasons for each of its strikes. Those reasons were acceptable to the trial judge, who, after considering all of the relevant circumstances, ruled that Nichols had not carried his burden of proving purposeful discrimination. In addition to the government's race-neutral explanations, we note that three jurors were black and that those jurors were seated while the government still had three peremptory challenges available. *See United States v. Lane*, 866 F.2d 103, 107 (4th Cir.1989) (where blacks are seated and not all peremptory challenges used, motive to discriminate is negated). Moreover, the government did not use all of its peremptory challenges to exclude blacks. *United States v. Terrazas–Carrasco*, 861 F.2d 93, 95 (5th Cir.1988) (if prosecutor had used all of his challenges to exclude members of defendant's race, defendant's argument might be stronger). On this record, we cannot say that the district court's finding was clearly erroneous. Accordingly, we hold that the government's explanations complied with the *Batson* mandate.

### III. CONCLUSION

In sum, we conclude that Nichols has not shown that he was prejudiced by the government's delay in charging him or that the prosecutor was motivated by actual vindictiveness in bringing the superseding indictment with increased charges after the declaration of the mistrial. Moreover, the finding by the trial judge that the government did not discriminate in its use of peremptory challenges was not clearly erroneous.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

The record amply supports the district court's finding that the prospective jurors were excused by the government not because they were black nor because they were female. They were excused because of the instability of their lifestyles. Accordingly, I would not announce definitively and gratuitously that the rationale of *Batson* is not applicable to gender based discrimination. That difficult question should wait for another day and be decided only when necessary to our decision. In all other respects, I join the majority's comprehensive and well-reasoned opinion.