19 F.3d 13
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marcus Duke SHELTON, Defendant-Appellant.
 No. 92-5588.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 29, 1993.
Decided March 4, 1994.
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James H. Michael, Jr., District Judge. (CR-90-208-R)
 James Greer Welsh, Timberlake, Smith, Thomas & Moses, P.C., Staunton, Va., for appellant.
 Peter Haggerty, Third Year Law Intern, Roanoke, Va., for appellee.
 On brief: Morgan E. Scott, Jr., United States Attorney, Stephen U. Baer, Assistant United States Attorney, Roanoke, Va., for appellee.
 W.D.Va.
 AFFIRMED.
 Before WIDENER and PHILLIPS, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Marcus Shelton appeals his conviction and sentence on one count of possession of crack cocaine with intent to distribute. 21 U.S.C.A. Sec. 841(a)(1) & (b)(1)(C) (West 1981 & Supp.1993). He challenges his conviction on the grounds of a Speedy Trial Act violation and a Batson violation, and several evidentiary rulings. He also challenges the district court's use for sentencing purposes of an amount of cocaine base equivalent to cash seized. We affirm both the conviction and the sentence.
 
 
 2
 * On the night of October 23, 1990, in Charlottesville, Virginia, three local police officers saw two people seated in a silver-gray Nissan parked on the side of a street. A third person stood on the sidewalk. When the officers made a U-turn to investigate, both doors of the Nissan were opened and two persons got out. Officer Bibb thought he recognized one of them as Shelton. The man Bibb believed to be Shelton scampered up a five to six foot embankment adjacent to the sidewalk. Although the man eluded the officers, he dropped several pieces of material--granular chunks--that were later stipulated to be 1.79 grams of crack cocaine. JA 41.
 
 
 3
 The officers returned to search the Nissan and discovered a small amount of residue cocaine (0.07 gram). Also, in the glove compartment were Shelton's personal identification card, birth registration notice, and pay stub, and papers showing that the car was registered to one Rhonda Morris. Shelton's identification card identified his address as that of Morris' apartment.
 
 
 4
 Later in the evening, officers searched Rhonda Morris' apartment under a search warrant. There they found and seized several items of evidence suggesting the presence of drugs (vials, a photograph of baggies and $1,741.00 in cash), and arrested Shelton, who came to the apartment while the officers were there.
 
 
 5
 Shelton's defense at trial was mistaken identity: that he was not the person who got out of the Nissan and was chased by the police. He put on three alibi witnesses, who stated that they had seen Shelton at various times on the night of October 23, 1990 driving a burgundy car and wearing a green shirt and black pants.[1] Rhonda Morris also testified in his defense, corroborating the testimony of the other three witnesses, and asserting that she loaned her gray Nissan to a third party on October 23, 1990. She also testified that Shelton's ID card and pay stub were in her car because she cashed his check each week and kept part of the money for their daughter, and that the money seized belonged to her and was being saved for her daughter for Christmas.
 
 
 6
 Following Shelton's conviction by the jury, the district court sentenced him to 144 months imprisonment. At the sentencing hearing, the court attributed to Shelton an amount of cocaine base equivalent to $1,741.00 for the purpose of determining Shelton's relevant conduct.
 
 
 7
 This appeal followed.
 
 II
 
 8
 We first address Shelton's claim that the indictment should be dismissed because of a violation of the Speedy Trial Act, 18 U.S.C. Sec. 3161 et seq.
 
 
 9
 Shelton was indicted on December 14, 1990, and was taken into custody on December 20, 1990. On December 21, 1990, Shelton appeared before a judicial officer for a bail hearing. Shelton was arraigned on January 28, 1991; he entered a plea of not guilty and asked for a speedy trial. On February 27, 1991, Shelton filed a discovery motion under Rule 16, Fed.R.Crim.P., and for any material that must be disclosed under Brady v. Maryland, 373 U.S. 83 (1963). The following day, the government filed a motion for a continuance because an essential witness, Detective Dennis Dean, who was one of the officers in the patrol car on the night of October 23, 1990, had been called to duty in "Operation Desert Storm." The district court granted the continuance on March 6, 1991, "until Detective Dean [was] relieved of his military duty overseas or until such further time as the court deem[ed] proper." On April 8, 1991, the government informed the court that Dean was available as a witness, and a new trial date of June 10, 1991, was set. Four days before the trial was to begin, Shelton's attorney moved for and eventually received permission to withdraw as counsel. Shelton was tried and convicted on December 23, 1991.
 
 
 10
 The Speedy Trial Act requires that a defendant be brought to trial within seventy days of the filing of the indictment or his first appearance before a judicial officer, whichever is later. 18 U.S.C. Sec. 3161(c)(1). Certain events, however, toll the running of the speedy trial period. See 18 U.S.C. Sec. 3161(h). The parties agree that Shelton's trial had to begin on or before February 28, 1991, absent any excludable days, and we do not inquire into the correctness of that date. The government argues that under Sec. 3161(h)(1)(F) & (J), Shelton's pretrial motion tolled the clock from February 27th until at least March 6th, and that the clock remained stopped during the continuance, from March 6th until April 8th, under Sec. 3161(h)(3)(A). On April 8th, the court set a new, mutually convenient date, and, according to the government, for this reason, the period April 8th to June 6th is excluded. Shelton contends that none of these events halted the speedy trial clock, so that the seventy-day period expired before his trial commenced. We disagree.
 
 
 11
 We consider the three tolling events in order.
 
 
 12
 * Pursuant to subsections 3161(h)(1)(F) & (J), an excludable period begins when a pretrial motion is filed.[2] Subsection (F) tolls the speedy trial clock in two situations. First, when a hearing is held, the statute excludes the time between the filing of the motion and the conclusion of the hearing. Second, if no hearing is required, the period from the filing of the motion until "prompt disposition of, such motion" is excluded. Subsection (J) limits the time available for prompt disposition of the motion to thirty days from the point the motion is "actually under advisement" by the court. See Henderson v. United States, 476 U.S. 321, 329 (1986). A motion is "actually under advisement" when the court has received all papers from the parties necessary for it to rule on the motion.
 
 
 13
 Despite the statute's reference to "any" pretrial motion, see 18 U.S.C. Sec. 3161(h)(1)(F), Shelton argues that certain discovery motions--in particular, Brady motions and Rule 16 requests--should not automatically trigger a statutory exclusion from the seventy-day period because the statute is aimed only at pretrial motions which contemplate a hearing or ruling. In the case of Rule 16 discovery requests, the Sixth Circuit has held as Shelton urges us to do, concluding that Rule 16 motions do not always toll the speedy trial clock. United States v. Mentz, 840 F.2d 315, 329 (6th Cir.1988) ("Because the district court never held a hearing or ruled on the motion, and there is no other indication that the [Rule 16] motion was 'actually under advisement,' the motion did not trigger the statutory exclusions for delay ....") (citations omitted). The Mentz court noted that the drafters of Rule 16 intended parties to invoke the rule without intervention by the trial court. Id. at 328 (reviewing comments of the Advisory Committee on Rules and the Judiciary Committee of the House of Representatives). In fact, unless a dispute arises between the parties, a formal motion under the rule is not necessary. Mentz viewed the Rule 16 motion merely as a pro forma request which did not toll the speedy trial clock. Id. at 329.
 
 
 14
 We do not have occasion here to reach the issue addressed in Mentz because we believe that Shelton's motion for Brady material triggered an excludable period under Sec. 3161(h)(1)(F) & (J) regardless of the effect of the Rule 16 request. The rule of Brady is not a rule of discovery, but of constitutional right to exculpatory evidence. 2 Charles A. Wright, Federal Practice and Procedure Sec. 254, at 78, 81 (1982); United States v. Starusko, 729 F.2d 256, 262 (3d Cir.1984) ("Brady 'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.' ") (citing United States v. Beasley, 576 F.2d 626, 630 (5th Cir.1978), cert. denied, 440 U.S. 947 (1979)). Although Brady material is often discoverable under Rule 16, the scope of the Brady rule and that of Rule 16 are not coextensive. 2 Wright, supra, Sec. 254, at 78-79; see also United States v. Kaplan, 554 F.2d 577, 580 (3d Cir.1977) ("[O]n occasion there will be an overlap between the two means a federal defendant uses to obtain information in the possession of the prosecutor."). Brady certainly does not share the history and unique attributes of Rule 16 seized upon in Mentz. We find that Shelton's motion for Brady material triggered the automatic statutory exclusion under Sec. 3161(h)(1)(F) & (J). Cf. United States v. Ortega-Mena, 949 F.2d 156, 158-59 (5th Cir.1991) (excluding time during which Brady motion was pending); United States v. Thomas, 788 F.2d 1250, 1257 (7th Cir.), cert. denied, 479 U.S. 853 (1986) (indicating that motion for discovery of Brady material tolls speedy trial clock). The speedy trial period was thus tolled from February 27 until at least March 6.[3]
 
 B
 
 15
 The next question is whether the period between March 6th and April 8th is excludable pursuant to Sec. 3161(h)(3)(A). That subsection excludes any delay resulting from the absence or unavailability of an essential witness. The statute defines a witness as absent "when his whereabouts are unknown and ... cannot be determined by due diligence"; similarly, a witness is unavailable "whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence." 18 U.S.C.A. Sec. 3161(h)(3)(B) (West 1985). Shelton does not contest the district court's finding that Dean was an essential witness but only whether the government made the requisite showing of due diligence.
 
 
 16
 In its Motion for a Continuance, the government alleged that Detective Dean had been called to active duty as part of Operation Desert Storm and that it was exercising due diligence to locate Dean and bring him back for trial. In support of its assertion of due diligence, the government referenced a Justice Department memorandum discussing the availability of military witnesses in connection with the "situation in the Middle East." The memorandum warns of delays and denials of requests for military witnesses, and explains that requests for military witnesses must be received four to six weeks before the court date.
 
 
 17
 The burden of proof clearly fell on the government to show that due diligence was being used to secure Dean's presence. See United States v. Bourne, 743 F.2d 1026, 1030 (4th Cir.1984). Granting a continuance under the Speedy Trial Act, however, lies within the sound discretion of the trial court. Id. at 1031. In view of the situation in the middle east and the fact that the Justice Department required four to six week notice for requests for military witnesses, we find no abuse of discretion by the district court in granting the continuance. The period between March 6th and April 8th is therefore properly excluded in the speedy trial computation under Sec. 3161(h)(3)(A).
 
 C
 
 18
 Finally, we consider the period between April 8th and June 6th. Shelton argues that once Dean was available as a witness, his trial should have begun "almost immediately" thereafter to avoid a Speedy Trial Act violation. Appellant's Brief at 12. Once notified of Dean's availability on April 8th, the district court, in the presence of both parties, immediately set a new trial date. Since the continuance was proper, the time between April 8th and June 6th is also correctly excluded. See United States v. Meyer, 803 F.2d 246, 248 (6th Cir.1986), cert. denied, 480 U.S. 936 (1987). We find no Speedy Trial Act violation.
 
 III
 
 19
 We next examine Shelton's claim, he being a black person, that his conviction must be vacated because the government exercised one of its peremptory challenges in a racially discriminatory manner by striking a black venireperson in violation of Batson v. Kentucky, 476 U.S. 79 (1986). The district court denied Shelton's motion to dismiss upon the government's articulation of what the court determined to be a neutral reason for the strike--that the man was a roofer and was separated from his wife. We review the district court's finding under a clearly erroneous standard. United States v. Tindle, 860 F.2d 125, 129 (4th Cir.1988), cert. denied, 490 U.S. 1114 (1989).
 
 
 20
 The use of a peremptory challenge to strike a potential juror solely on the basis of race violates the defendant's equal protection rights, as well as those of the venireperson. Under Batson, once the defendant establishes a prima facie case of racial discrimination, the burden shifts to the prosecution to "articulate a neutral explanation [for the strike] related to the particular case to be tried." Batson, 476 U.S. at 98. The government's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97. The defendant may then challenge the reason as pretextual.
 
 
 21
 Here, no specific evidence of pretext having been proffered by Shelton, we examine only whether the government's articulated reason for the strike was a sufficiently clear and specific non-racial explanation reasonably related to the trial. See United States v. Joe, 928 F.2d 99, 103 (4th Cir.), cert. denied, 112 S.Ct. 71 (1991). A venireperson's marital status and employment have been held to be legitimate, non-racial reasons for exercising a peremptory challenge. See, e.g., United States v. Miller, 939 F.2d 605, 609 (8th Cir.1991) (occupation); United States v. Nichols, 937 F.2d 1257, 1264 (7th Cir.1991), cert. denied, 112 S.Ct. 989 (1992) (marital status). We also note that of the three black persons on the venire, one was seated on the jury. While the presence of a black person on the jury does not automatically preclude a Batson claim, the presence of a member of the defendant's racial group does weigh against a finding of discrimination. Joe, 928 F.2d at 103. We hold that the district court did not err in its determination that there was no Batson violation.
 
 IV
 
 22
 We now review several evidentiary rulings challenged by Shelton. First, we consider whether the district court abused its discretion by permitting the government to cross-examine three defense alibi witnesses about the fact that they did not inform the police sua sponte of the information about which they testified. The government also questioned the witnesses about their refusal to discuss their testimony with police. Shelton contends the questioning was improper under Fed.R.Evid. 611 because it was superfluous and was not sufficiently probative of the witnesses' credibility.[4] He also argues that the evidence was inadmissible under Fed.R.Evid. 403.
 
 
 23
 We disagree. Evidence of bias is almost always relevant to the issue of a witness' credibility. See United States v. Abel, 469 U.S. 45, 52 (1984). Trial courts are afforded wide discretion in determining that particular evidence suggests bias. Edward W. Cleary, McCormick on Evidence Sec. 40, at 87 (3d ed.1984). The witnesses' reluctance to cooperate with police certainly could stem from hostility towards the police and a desire to aid Shelton through false testimony. It is the province of the jury to weigh and evaluate such inferences. The district court did not abuse its discretion by permitting the questioning as probative of the veracity of the witnesses' testimony, or in its determination that the evidence was admissible under Rule 403.
 
 
 24
 We next examine whether the district court erred in admitting certain testimony as relevant to the issue of the defendant's identity. Officer Bibb testified, over objection, that he was able to recognize the person running up the embankment as Shelton because of his numerous previous encounters with Shelton while he worked in the narcotics division of the police department. The objection, as we understand it, is that the reference to Shelton's previous police encounters constitutes, in effect, evidence of Shelton's character that is inadmissible under Fed.R.Evid. 404(a), or that even if not inadmissible as "bad character" evidence, it posed a danger of prejudice that substantially outweighed its probative value, hence should have been excluded under Fed.R.Evid. 403. We disagree. If considered under Rule 404 as evidence of "other bad acts," the testimony was expressly relevant under Rule 404(b) to prove Shelton's "identity," and was therefore admissible for that limited purpose unless, under the inquiry commanded by Rule 403, its probative value for that purpose was substantially outweighed by the danger of unfair prejudice. That inquiry is committed to the discretion of the district court, and we cannot declare that discretion was abused here in admitting the evidence.
 
 
 25
 We next consider Shelton's challenge to the district court's allowing the prosecution to impeach Rhonda Morris with a prior inconsistent statement during cross-examination. After a question by the prosecutor as to whether she denied Shelton was involved in the drug trade, Morris testified as follows:
 
 
 26
 Morris: I never seen him with drugs around me.
 
 
 27
 Q: Never in your life?
 
 
 28
 Morris: Nope.
 
 
 29
 Q: Never given a statement to any effect that he's been involved in the drug trafficking trade?
 
 
 30
 Morris: No.
 
 
 31
 Q: Perhaps this will refresh your memory. "6-27-88, Marcus went to Philadelphia Monday, the day before we got caught, and bought $1,100 worth of cocaine." JA 151-52. Defense counsel immediately noted an objection, which the court overruled for the reason that the question was proper impeachment. The prosecutor then embarked on a new line of questioning, without Morris having denied or admitted making the prior statement. Under the circumstances, there was no abuse of discretion in declining to strike this evidence. Shelton contends that admitting it somehow violated the evidentiary rule against impeaching by the use of extrinsic evidence of "collateral matters." But at the point where objection was made here--a mere inquiry about a previous statement inconsistent with an assertion just made by a witness--"there is no strict requirement that the previous impeaching statement must not deal with 'collateral' matters." McCormick on Evidence, supra, Sec. 36, at 77. Even if the impeaching statement was a "collateral matter"--a doubtful proposition--no attempt was made to prove its making by extrinsic evidence; the witness, with fair opportunity to respond, neither admitted nor denied making the statement; and the district court gave a proper limiting instruction confining its use to impeachment.
 
 V
 
 32
 We turn finally to two issues raised by Shelton in connection with evidence seized from Morris' apartment.
 
 
 33
 First, Shelton claims the admission into evidence of the $1,741.00 taken from Morris' apartment in the guilt phase of his trial was error because insufficient evidence linked the cash to Shelton. This challenge is clearly without merit. The money was recovered from a dresser containing both men and women's clothing in an apartment which Shelton indisputably frequented and which was listed on his identification card as his residence; and Morris testified at one point that the money belonged in part to Shelton. Though the evidence that the cash was Shelton's was obviously not conclusive of that fact, it was sufficient to establish its relevance for the purpose admitted--to prove that, as his, it supported the further inference that he possessed it in connection with the drug trafficking offense with which he was charged.
 
 
 34
 Shelton also challenges the use of this evidence to establish as relevant conduct for sentencing purposes the amount of cocaine base equivalent to the cash seized from Morris' apartment. See U.S.S.G. Sec. 1B1.3(a)(2). Based on Detective Campbell's testimony as to the going price of the drugs attributed to Shelton's possession, the district court converted the $1,741.00 to 8.7 grams of cocaine base, see JA 234, resulting in a total of 10.4 grams of cocaine base attributed to Shelton.[5] Under Sec. 2D1.1(a)(3) of the Sentencing Guidelines, Shelton was assigned a base offense level of 26.
 
 
 35
 The conversion of cash to drugs is permissible for this purpose under appropriate circumstances. United States v. Hicks, 948 F.2d 877, 882-83 (4th Cir.1991); U.S.S.G. Sec. 2D1.1 Application Note 12 ("Where ... the amount [of drugs] seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.") Our inquiry here is limited to whether the district court clearly erred in its factual determination that the money seized was drug-related and belonged to Shelton. A review of the record reveals sufficient evidence to support the district court's conclusion, including: Morris' conflicting testimony as to the ownership of the money,[6] evidence that Shelton frequently occupied the apartment, information from an informant that drugs were sold out of Morris' apartment, see Hicks, 948 F.2d at 883; United States v. Smith, 887 F.2d 104, 108 (6th Cir.1989) (hearsay properly considered at sentencing if it has minimal indicia of reliability), and evidence that the legally-earned income of Morris and Shelton, either separately or combined was inadequate to account for the seized cash.
 
 
 36
 This evidence was sufficient to support the sentencing judge's determination, by a preponderance of the evidence, that the cash was Shelton's, and that it reflected possession of an equivalent amount of cocaine base as a part of Shelton's conduct relevant to that charged.
 
 
 
 [1]
 The officers had described the man who dropped the cocaine on the embankment as wearing blue jeans and a light colored t-shirt and windbreaker. See JA 62-63
 
 
 [2]
 Subsection (F) provides that"delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from the seventy-day period. 18 U.S.C.A. Sec. 3161(h)(1)(F) (West 1985) (emphasis added). Subsection (J) excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." Id. Sec. 3161(h)(1)(J)
 
 
 [3]
 The record before us does not reveal any ruling on or "other prompt disposition" of the motion. We assume that the automatic thirty-day period was in effect
 
 
 [4]
 Rule 611 provides, in part:
 (a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses ... so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time, ...
 (b) Scope of cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness....
 Fed. R. Evid 611(a) & (b).
 
 
 [5]
 At trial, the parties had stipulated that a total of 1.86 grams was recovered from the embankment and the Nissan. Adding 8.7 grams to that amount results in a total of 10.56 grams. We note that the discrepancy would have made no difference in the calculation of Shelton's sentence
 
 
 [6]
 She had testified at trial that half of the money belonged to her and the rest to Shelton though later she claimed it was all hers